IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CLIFFORD SCOTT MEDLEY, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 2:07-CV-051 |
| | § | |
| WILLIAM STEPHENS, | § | |
| Director, Texas Dep't of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

## REPORT AND RECOMMENDATION
## TO DENY PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner CLIFFORD SCOTT MEDLEY has filed a Petition for a Writ of Habeas Corpus by a Person in State Custody challenging his murder conviction out of the 251st District Court of Potter County, Texas, and the resultant forty-year sentence. For the reasons set forth, the United States Magistrate Judge is of the opinion petitioner's application for federal habeas corpus relief should be DENIED.

I.
FACTUAL AND PROCEDURAL BACKGROUND

In June of 1995, police discovered the body of Frankie Steinbrecker at the bottom of a ravine off of the Fritch Highway. (*State v. Medley*, No. 35,170-C, "Reporter's Record," [hereinafter RR], vol. 6, pgs. 185-86, 197 (251st Dist. Ct. of Potter Cty., Tex., Mar. 5, 2002)). She had been strangled. (*Id.*, vol. 7 at 22). After an investigation, police suspected petitioner Medley had murdered Ms. Steinbrecker and had dumped her body in the ravine in an attempt to hide the crime. (*Id.*, vol. 6 at 186, 222). Petitioner was indicted for murder. (*Id.*, "Clerk's Record," vol. 1, pg. 2 (Aug. 7, 1998)). The case went to trial with petitioner representing himself during the guilt/innocence phase of trial but

being represented by counsel during the punishment phase of trial.  Medley was found guilty, and the jury sentenced him to imprisonment for life.  (RR, vol. 7 at 221).  Petitioner appealed the conviction, contending his Sixth Amendment right to representation by counsel had been violated.  *Medley v. State*, 47 S.W.3d 17, 21 (Tex. App.—Amarillo 2000, pet. ref'd).  The appellate court held the trial court erred in denying Medley's pretrial request to withdraw his waiver of counsel and that such constituted a Sixth Amendment violation.  *Id.* at 25-26.  The conviction was reversed and the case was remanded for a new trial.  *Id.*

At the second trial, petitioner was represented by counsel throughout.  Testimony at the second trial established Medley and Ms. Steinbrecker were romantically involved and had been living together at the Coachlight Inn in Amarillo, Texas.  (RR, vol. 6 at 14-15).  A friend of Ms. Steinbrecker's testified to the on-again, off-again relationship between Ms. Steinbrecker and Medley.  (*Id.* at 57-58).  Ms. Steinbrecker's son, Lathan Douglas, testified that on the day of his mother's murder (May 30, 1995) he and Ms. Steinbrecker planned on going to the hotel room Ms. Steinbrecker shared with Medley, gathering her belongings from the room, and moving Ms. Steinbrecker in with her mother.  (*Id.* at 20-21).  Mr. Douglas indicated he saw Mr. Medley that day and spoke with him about Ms. Steinbrecker moving out.  (*Id.* at 22).  According to Mr. Douglas, Mr. Medley did not want Ms. Steinbrecker to leave.  (*Id.*).  At some point, Mr. Douglas left his mother and Mr. Medley at a friend's house.  (*Id.*)  Later that same day, Ms. Steinbrecker and Mr. Medley arrived at the house of Evelyn Douglas, who was Mr. Douglas's grandmother and Ms. Steinbrecker's mother.  (*Id.* at 13, 23).  At that time, Mr. Douglas observed Ms. Steinbrecker was "real upset," and Mr. Medley "was just kind of really, just angry at her and stuff, yelling at her."  (*Id.* at 24).  Mr. Medley left for approximately two hours and returned to the house "even angrier."  (*Id.* at 24-25).  Mr. Medley left again and returned approximately five minutes later.  (*Id.* at 26).  At that point (at approximately 6:30 p.m.), Ms.

Steinbrecker accompanied Mr. Medley to the hotel room to retrieve her belongings and was planning to return to Ms. Douglas's house. (*Id.*). Ms. Steinbrecker did not return, and that was the last time Mr. Douglas saw Ms. Steinbrecker alive. (*Id.* at 27).

Wendy Lambert, Mr. Medley's ex-wife, also testified. She stated that on the night of the murder, at around 9:00 p.m., Mr. Medley called her. (*Id.* at 95). Medley told Ms. Lambert he had gotten his truck stuck in the mud on a dirt road in the country and needed her assistance getting the truck unstuck. (*Id.* at 102-03). Ms. Lambert eventually agreed to help and met Mr. Medley at his hotel room at the Coachlight Inn. (*Id.* at 103). Ms. Lambert stayed in her vehicle as Mr. Medley loaded into the back of the vehicle what Ms. Lambert thought were tools for freeing the truck. (*Id.*). Ms. Lambert testified she drove, with Mr. Medley directing her, into the country where his truck was ostensibly stuck. (*Id.* at 105-06). Rather than directing her to his truck, however, Mr. Medley had Ms. Lambert drive to "the middle of nowhere," at which point Mr. Medley exited and went to the back of the vehicle. (*Id.* at 108). Ms. Lambert turned to ask him where the pickup was, but Mr. Medley had already removed something from the back of Ms. Lambert's vehicle and was walking away from the car. (*Id.*). Ms. Lambert observed Mr. Medley carrying a bundle wrapped in a blanket in a manner that reminded Ms. Lambert of a person "[c]arrying someone over the threshold." (*Id.* at 108-09). When Mr. Medley got back into the car, Ms. Lambert pressed him concerning what he had just dumped. (*Id.* at 110). Mr. Medley eventually told Ms. Lambert "it had to do with drugs and to leave it alone." (*Id.* at 110-11). Ms. Lambert took Mr. Medley back to his hotel room and did not pursue the matter at that point. (*Id.* at 111).

The next morning, Mr. Medley had an acquaintance take him to his truck, which was stuck in the mud on a country road. (*Id.* at 66). The only evidence regarding the details of how Mr. Medley spent the majority of that day came through Mr. Medley's testimony, which will be discussed *infra*.

The next person to testify who saw Mr. Medley that day (the day after the murder) was Jackie Johnson. Mr. Johnson owned a house in the country.  (*Id.* at 244).  At approximately 9:00 p.m. that day, which was the day after Ms. Steinbrecker's murder, Mr. Johnson discovered Mr. Medley in a field outside Mr. Johnson's house "rolled up in a ball with a towel over his head," wearing a pair of Mr. Johnson's coveralls and trying to bury himself in the mud.  (*Id.* at 248).  Mr. Johnson escorted Mr. Medley back to the porch of the house and held Mr. Medley at gunpoint until the police arrived.  (*Id.* at 247, 249-50).  Upon inspection of a detached garage on his property, Mr. Johnson discovered the wagon he kept in the garage had been moved outside.  (*Id.* at 245).  Mr. Medley's pickup truck was in the garage.  (*Id.* at 251).  Tarps had been used to section off the garage into separate, room-like areas.  (*Id.* at 252).  Both a side-entrance door and the front double doors to the garage had been secured from the inside so as to make entry from the outside difficult.  (*Id.* at 253).  The only way in and out of the garage was via a hole that had been cut in the roof of the garage.  (*Id.* at 254).

When the police came to the aid of Mr. Johnson, they arrested Mr. Medley for vandalism of Mr. Johnson's detached garage.  (*Id.* at 266).  On the way to jail, Medley kicked out one of the back windows of the patrol car, escaped, and fled.  (*Id.* at 269-70).  The police officer gave chase and watched as Medley, who was not wearing any shoes, jumped down an embankment over ten-feet high, onto concrete, breaking both of his heels and puncturing a lung.  Mr. Medley continued to flee until the officer caught him.  It took several police officers to subdue Medley and take him into custody. (*Id.* at 270-75, 278).  The police then took Mr. Medley to the hospital.  (*Id.* at 279).

Apparently Mr. Medley stayed in the hospital for several days as his injuries were treated. Wendy Lambert discovered Mr. Medley had been hospitalized and went to the hospital to check on him.  (*Id.* at 112).  When she saw Ms. Steinbrecker was not at the hospital, Ms. Lambert asked Mr. Medley if she should contact Ms. Steinbrecker.  (*Id.* at 113).  Mr. Medley declined, stating the two had

broken up.  (*Id.*).  With the events of the night of May 30, 1995, and the early morning of May 31,

1995, on her mind, Ms. Lambert approached Mr. Medley's brother, Samuel Edwards.  (*Id.* at 114).

She discussed with him the events of that night and indicated Medley had dumped what he said was

drug paraphernalia but what she believed to be a body.  (*Id.* at 171).  Mr. Edwards and Ms. Lambert

decided to locate whatever it was Mr. Medley had dumped.  (*Id.* at 115, 173-74).

After some searching, the two eventually discovered the location where Medley had directed

Ms. Lambert to on the night of May 30, 1995.  Mr. Edwards got out of the vehicle and began

searching.  (*Id.* at 165).  Approximately seventy-five to one hundred feet from the road, Mr. Edwards

discovered a body.  (*Id.* at 168-69).  The two returned to town and notified the police.  (*Id.* at 118).

They took the police back to the body's location.  (*Id.* at 183-84).

The police determined the body was Frankie Steinbrecker.  (*Id.* at 197).  The medical examiner

who performed the autopsy of Ms. Steinbrecker testified Ms. Steinbrecker's sternocleiodomastoid (a

major neck muscle) and windpipe had hemorrhaged and her voice box was fractured, injuries

consistent with strangulation.  (*Id.*, vol. 7 at 15-16).  The medical examiner also testified that the means

by which Ms. Steinbrecker was strangled, which consisted of a balled-up sock wrapped in a towel with

a coat hanger overlaying the towel wrapped around Ms. Steinbrecker's neck, was a mechanism by

which a greater amount of force could be applied to the front part of the neck (as opposed to

strangulation with the hands alone), increasing the likelihood of death.  (*Id.* at 24-25).

Petitioner Medley then testified and presented the following:

He spoke with Ms. Steinbrecker on May 30, 1995.  (*Id.* at 60).  Ms. Steinbrecker indicated she

did not have any place to live, so Mr. Medley took her to his hotel room, which they had previously

shared.  (*Id.* at 59, 62-63).  After dropping Ms. Steinbrecker off, Mr. Medley went to work.  He

testified he was still working when his ex-wife, Ms. Lambert, showed up at his job site later that day.

(*Id.* at 64).  According to Mr. Medley, Ms. Lambert informed him she had gone by Mr. Medley's hotel room and had discovered a body.  (*Id.* at 124).  In reaction to this, Mr. Medley decided to leave his job and go see a friend who lived in the country to seek advice.  (*Id.* at 127).  On the way to his friend's house, his truck got stuck in the mud (*Id.* at 128), and Mr. Medley was out in the country with his truck until nighttime, when he was able to catch a ride into town.  (*Id.* at 129).

Back in town, Mr. Medley contacted Ms. Lambert, eventually convincing her to meet him so the two of them could go to the police together.  (*Id.* at 136).  After discussing the matter, however, he said they abandoned that plan and decided they should dump Ms. Steinbrecker's body instead.  (*Id.* at 139-40).  At that point, Mr. Medley (for the first time since Ms. Lambert told him about the body) went to his hotel room and found Ms. Steinbrecker's body wrapped in a blanket.  (*Id.* at 142).  According to Mr. Medley, he and Ms. Lambert dumped the body in the country.  (*Id.*).  Ms. Lambert took him back to the hotel room, where he spent the remainder of the night.  (*Id.* at 145).

The next morning, Mr. Medley obtained a ride back to his truck, which he said was still stuck in the country.  (*Id.*).  After freeing the truck and washing it, Mr. Medley went back to the hotel room.  (*Id.* at 148).  At that point, a man who Mr. Medley did not know "just showed up" at the motel room door.  (*Id.* at 149).  The stranger asked what had happened to the dope, to which Mr. Medley responded he was unaware of any dope.  (*Id.*).  The man insisted Ms. Steinbrecker had taken dope, apparently belonging to him (the stranger).  (*Id.*).  The man asked to look around the room and in Mr. Medley's truck, which Mr. Medley allowed.  (*Id.* at 150).  At that point, the man gave Mr. Medley some kind of unknown drug, which Mr. Medley ingested at the stranger's insistence.  (*Id.* at 151-52).  The man then left.  (*Id.* at 153).

Having ingested the unknown drug, "something came over" Mr. Medley.  (*Id.* at 155).  He testified he got in his truck and began driving around town, eventually ending up at Mr. Johnson's

property in the country. (*Id.* at 156). Mr. Medley indicated Mr. Johnson's testimony was correct regarding the alterations he had made to Mr. Johnson's detached garage and how Mr. Johnson discovered him. (*Id.* at 157-58). He additionally indicated the police officer's testimony regarding his escape from the officer's patrol car and his jump off of a concrete embankment was accurate. (*Id.* at 159). Medley's testimony concluded at this point.

The State called Ms. Lambert on rebuttal, who testified she did not see Mr. Medley until the late evening hours of May 30, 1995. (*Id.* at 189). Ms. Lambert denied finding Ms. Steinbrecker's body earlier that day and denied any participation in any plan to conceal Ms. Steinbrecker's murder. (*Id.* at 190). Lathan Douglas also testified on rebuttal that he saw Ms. Steinbrecker leaving with Mr. Medley at approximately 6:30 in the evening on May 30, 1995. (*Id.* at 196-97).

The jury found Mr. Medley guilty of murder and sentenced him to forty years in prison. The judgment was affirmed on direct appeal, and the Texas Court of Criminal Appeals refused Medley's petition for discretionary review. *See Medley v. State*, No. 07-02-0145-CR, 2004 WL 1839315 (Tex. App.—Amarillo Aug. 17, 2004, pet. ref'd). The United States Supreme Court denied certiorari. Medley filed a state habeas corpus application, which was dismissed for failure to comply with state procedures. *In re Medley*, WR-66,218-02. He refiled the state habeas corpus application, which was then denied without written order. *In re Medley*, WR-66,218-03.

Medley filed his federal habeas petition after he filed his first state habeas application but before the Court of Criminal Appeals dismissed that application for failure to comply with the required procedure. This Court initially found Medley's federal habeas action was barred by the one-year statue of limitations. *See* 28 U.S.C. § 2244(d). After development of additional facts during the direct appeal of this Court's dismissal, the Fifth Circuit concluded Medley's federal habeas corpus petition was timely filed and remanded the case to this Court. *See Medley v. Thaler*, 660 F.3d 833 (5th Cir. 2011).

## II.
## PETITIONER'S ALLEGATIONS

Petitioner contends he is in custody in violation of the United States Constitution and the laws of the United States for the following reasons:

1.     Statements from the first trial were improperly used to impeach petitioner at the second trial.

2.     Petitioner's conviction was obtained in violation of the Double Jeopardy Clause.

3.     Petitioner's conviction was obtained by use of a coerced confession.

4.     Petitioner's conviction was obtained in violation of the privilege against self-incrimination.

5.     Petitioner's conviction was obtained by the use of an "impelled" confession.

6.     The trial judge was biased.

7.     The second trial failed to purge the unconstitutional taint of the first trial.

8.     Trial counsel was ineffective in violation of the Sixth Amendment.

9.     Appellate counsel was ineffective in violation of the Sixth Amendment.

## III.
## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a petitioner may not obtain habeas corpus relief in federal court with respect to any claim adjudicated on the merits in the state court proceedings unless the adjudication of the claim resulted in a decision contrary to clearly established federal constitutional law or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d). When, however, there has been no resolution on the merits by the state courts, the federal courts do not utilize the deferential standards under the AEDPA and review is *de novo*.  *Solis v. Cockrell*, 342 F.3d 392, 394 (5th Cir. 2003).

HAB54\R&R\Medley-51.deny.5:  3

Medley has filed a motion asking for what he classifies as "plenary review," contending the AEDPA deferential standard does not apply to his case and urging the Court to instead conduct a plenary review of his claims. ("Petitioner's Motion to Conduct Plenary Review of his § 2254 Habeas Claims with Brief in Support," doc. 121 [hereinafter "Motion for Plenary Review"], pg. 3 (filed Nov. 20, 2012)); *see Solis*, 342 F.3d at 394. Petitioner's AEDPA contention is incorrect. In his pro se brief on direct appeal following the second trial (after his appointed attorney filed an *Anders* brief), petitioner presented twenty claims to the state intermediate appellate court, some of which he again raises in his federal habeas petition. That court grouped those twenty issues into "four substantive areas," three of which were further grouped together. *Medley*, 2004 WL 1839315 at * 1. After the appellate court affirmed petitioner's conviction, petitioner filed a petition for discretionary review, which was refused in a short order. *See Medley v. State*, No. PD-1777-04 (Nov. 12, 2004). Petitioner then filed a state habeas corpus application, *In re Medley*, WR-66,218-02, which was dismissed for non-compliance with procedural rules. His second state habeas corpus application, again raising grounds similar to those raised in these federal proceedings, was denied without written order or form of explanation. *In re Medley*, WR-66,218-03 (Jan. 23, 2008).

Petitioner contends that because the state courts never issued any written opinion or determination specifically addressing each of his grounds of error, either on direct appeal or habeas corpus review, they never "adjudicated" the merits of each claim, making 28 U.S.C. § 2254(d) inapplicable. (Motion for Plenary Review at 6). The AEDPA, however, does not require a "statement of reasons" from any state court as a prerequisite before the federal court affords the state court's denial of state habeas relief the AEDPA's deferential standard. *Harrington v. Richter*, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011).

The statute [28 U.S.C. § 2254(d)] refers only to a "decision," which resulted from an "adjudication."  As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion *does not require that there be an opinion from the state court explaining the state court's reasoning* . . . And as this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d).  Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.

*Id.* (internal citations omitted) (emphasis added).  In his petition for discretionary review, petitioner raised some of the same grounds of error that he now raises in his federal petition.  That petition was refused.  Despite the lack of discussion for its decision, a state court's refusal to grant discretionary review on appeal is considered an adjudication on the merits.  *See id.*; *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999); *Cavaliere v. Quarterman*, No. H-07-4392, 2009 WL 890397 at *5 (S.D. Tex. Mar. 27, 2009).  Medley then raised the same grounds in his state habeas corpus application that he now raises in his federal petition.  The state habeas corpus application was denied without written order.  Even without a written explanation, the Court finds this denial was an adjudication on the merits.[1]  *Harrington*, 131 S.Ct. at 784.

Petitioner also urges the Court to "look through" the holdings of the state court.  (Motion for Plenary Review at 8); *see Ylst v. Nunnemaker*, 501 U.S. 797, 806, 111 S.Ct. 2590, 2596, 115 L.Ed.2d 706 (1991).  Applying the "looking through" analysis to the petition for discretionary review, however, yields the result that neither the appeal nor the petition for discretionary review were denied on procedural grounds but instead were denied on the merits.  Moreover, many of the claims petitioner presents in his federal petition were not presented on direct appeal but instead were presented for the first time at the state habeas corpus level.  The Court of Criminal Appeals denied the habeas corpus

---

[1]  Petitioner contends that because claims raised in habeas corpus are generally not cognizable on direct appeal, this Court should consider the Court of Criminal Appeals's denial of habeas corpus application as a procedural ruling rather than a ruling on the merits.  The Court is disinclined to take this approach because the Court of Criminal Appeals explicitly *denied*, rather than dismissed, the application.  *See Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997) (establishing a denial of relief constitutes a denial on the merits of a claim.

application without written order, which, as discussed above, constitutes a ruling on the merits.  *See Harrington*, 131 S.Ct. at 784-85 (holding "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary"); *Bledsue v. Johnson*, 188 F.3d 250, 257 (5th Cir. 1999) *citing Ex Parte Torres*, 943 S.W.2d at 472.  In fact, there is no indication in any relevant state court opinion that relief was denied based upon anything but the merits.  Accordingly, this Court affords those state court rulings the full AEDPA deference to which they are entitled, despite the fact they were unaccompanied by any written opinion.  *See* 28 U.S.C. § 2254(d); *Harrington*, 131 S.Ct. at 784.  Petitioner's contention that the Court should do otherwise is without merit.

Since the state court heard and adjudicated on the merits, the claims petitioner presents in his federal habeas corpus petition, petitioner's burden before this Court is significantly heightened, i.e., petitioner cannot prevail even if he shows the state court's determination was incorrect.  Petitioner must also show the state court unreasonably applied federal law or made an unreasonable determination of the facts.  28 U.S.C. § 2254(d); *Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir. 2002), *cert. denied, Neal v. Epps*, 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

Petitioner has failed to meet this burden.  Rather than explaining why the state court's determination was unreasonable, petitioner, for the most part, merely restates and reargues the same grounds he presented to the state court and urges this Court to rule differently.  He has not established the state court unreasonably applied federal law or made an unreasonable determination of the facts. *See Neal*, 286 F.3d at 235.  As detailed below, there is nothing in the record or in petitioner's arguments warranting habeas corpus relief.  Consequently, this petition should be denied.

IV.

<u>MERITS</u>

Although petitioner Medley has listed nine grounds for relief, in-depth review and analysis of his petition reveals petitioner essentially has one main claim, which is whether the State's use of his sworn testimony from his first trial to impeach his testimony at his second trial constituted a violation of Medley's constitutional rights.  Other than this claim, which is presented in grounds one, three, four, and five, all of Medley's other claims appear to be subject to summary dismissal, particularly the claims based upon an alleged conspiracy between trial counsel, appellate counsel, and the trial judge to deny Medley a fair trial and to convict him.  Nevertheless, the court has addressed each of petitioner's nine claims in detail, resulting in a lengthy Report and Recommendation.  The issuance of the lengthy Report and Recommendation does not indicate the petitioner's claims are arguable or present substantial issues.  Instead, the length of the Report and Recommendation is a result of petitioner's multiple pleadings and to permit full review by the District Judge.  The fact that petitioner has merely presented the same arguments in his federal petition that he presented to the state courts, without regard for the AEDPA's deferential standards, remains.

*A.  Impeachment at the Second Trial*

In his first ground of error, petitioner Medley contends the State improperly used evidence from the first trial to impeach him at the second trial.  At the first trial, petitioner represented himself and testified.  As set out previously, the conviction from the first trial was overturned by the intermediate state appellate court based upon its determination the conviction was obtained in violation of petitioner's Sixth Amendment rights, i.e., the trial court erred by denying Medley's request to withdraw his waiver of counsel.  *Medley*, 47 S.W.3d at 25.

### 1.   What Transpired at the Second Trial

At the second trial, after the State rested the trial court, at the request of defense counsel, conducted a hearing outside the jury's presence.  (RR, vol. 7 at 47).  After initially representing to the court he did not wish to testify, Medley changed his mind and indicated he did want to testify, knowing it was against his attorney's advice.  (*Id.* at 51).  During another hearing, also outside the jury's presence, the following exchange occurred between petitioner Medley and his attorney:

> Q.   Okay.  I've explained to you the dangers of testifying, including the fact that the State may be able to bring up prior events, prior criminal history, things like that?
>
> A.   Yes.
>
> Q.   Okay.  You understand that you have previously testified in this case and that the State may have the ability to use some of that testimony to impeach you?
>
> A.   Yes.
>
> Q.   Okay.  And it's still your conscious desire to want to testify?
>
> A.   Yes.

(*Id.* at 53-54).  Petitioner then testified on direct examination before the jury.  Early into the State's cross-examination, and upon the prosecutor's request, the trial court excused the jury to discuss whether petitioner's testimony from the first trial could be used for impeachment purposes.  (*Id.* at 80). The trial court had initially ruled "any mention of the previous trial would be inadmissible."  (*Id*. at 81).  The prosecutor indicated he would not mention the prior statements came during the course of the first criminal trial.  (*Id.*).  In response, defense counsel contended the testimony from the first trial was completely inadmissable because it was given in violation of Mr. Medley's right to counsel.  (*Id.* at 82).  After recessing to consider the issue, the trial court made the following ruling:

THE COURT: Counsel, in addressing the objection before the Court, I feel compelled to do something that probably is not good judicial discretion, nor very prudent, and that is to criticize the higher Court.

It should go without saying that I strongly disagree with the opinion of the 7th Court of Appeals in the original trial of this case, that I feel that they missed the point entirely, that I feel that Mr. Medley was given a fair trial and that the 7th Court not agreeing, I respect their right to disagree as I expect them to respect my right to disagree with them.

And I feel compelled to make that comment because Counsel's objection has really put me on the horns of a dilemma, and that is, am I going to follow the law or am I going to follow my own personal convictions?

The law of the case is that the testimony from the first trial was in violation of the Defendant's constitutional right of representation by counsel. And although I personally disagree, that is the law of the case. The Court finds that the testimony was obtained in violation of his constitutional rights and will suppress any cross-examination using testimony from the prior trial.

(*Id.* at 83-84). The prosecutor pressed the issue, contending there was case law supporting the position that statements taken in violation of constitutional rights were still admissible for impeachment purposes. (*Id.* at 84). At the prosecutor's request, the trial court recessed for the day to allow briefing. (*Id.* at 86). The following day, based upon case law cited by the prosecution, the trial court held a hearing to determine whether petitioner's testimony from the first trial satisfied "standards of trustworthiness, in particular, the voluntariness of the testimony." (*Id.* at 88). After petitioner Medley's lengthy testimony, outside the jury's presence, the Court made the following ruling:

THE COURT: Counsel, the Court draws a distinction between the decision to testify and the testimony itself. While I understand that Mr. Medley feels that he was compelled to testify in order to present a defense, that is to be distinguished from being compelled to give truthful or false testimony once he made the decision.

Personally, I find that Mr. Medley was not compelled to testify . . . But even if others were to disagree and find that that was an involuntary decision to testify, having taken the stand, the Defendant had an obligation to tell the truth and speak truthfully and accurately.

And the Court finds there were [sic] no opposition, nothing that prevented him from telling the truth, that his testimony was not influenced by any other outside forces.

So the Court finds that the sworn statements of the Defendant given in the first trial were freely and voluntarily given in the context of the first trial, finding that those statements were freely and voluntarily given in accordance with *Harris v. New York*,

I find that they satisfy the legal standards of trustworthiness and are usable for purposes of impeachment.

(*Id.* at 108-09). In making his ruling, the trial judge indicated "I have read and considered *Harris v. New York*, *Michigan v. Harvey*, *Garza v. State*, *Brownley v. State*, *Garrett v. State*, *Brian v. State*, *McBride v. State*, *Whiddon*, W-h-i-d-d-o-n, *v. State*, and *Robinson v. State*, which were all furnished to the Court by Counsel." (*Id.* at 110). The jury was called back into court, and the prosecutor began his cross-examination, during which he impeached petitioner on several areas of petitioner's testimony.[2] After Medley's testimony concluded, the State recalled Ms. Lambert and Mr. Douglas, both of whom contradicted several areas of petitioner's testimony.[3]

In its charge to the jury on guilt/innocence, the trial court included a special instruction on impeachment:

> You are instructed that any witness may be impeached by showing that they have made other and different statements out of court, or upon a formal judicial investigation of the facts, from those made before you during the trial. You may consider such impeaching evidence, if any, as it may tend to affect the weight to be given the testimony of the witnesses so impeached and their credibility (if it does do so); but such impeaching evidence, if any, is not to be considered by you as tending to establish the alleged guilt of the defendant, or any fact in the case.

(*State v. Medley*, No. 35,170-C, "Clerk's Record" (from the second trial) [hereinafter CR #2], vol. 1, pg. 104 (251st Dist. Ct. of Potter Cty., Texas, Mar. 11, 2002)). Petitioner Medley's testimony at the

---

[2] Some of the major areas the prosecutor impeached petitioner on were regarding the last time he saw Ms. Steinbrecker alive (RR, vol. 7 at 122-23) and the first time he saw Ms. Lambert the day of Ms. Steinbrecker's murder (*Id.* at 123). The story about Ms. Lambert discovering the body and the plan between Ms. Lambert and Mr. Medley to cover up the murder had not been presented at the first trial and was first presented in the second trial. (*Id.* at 125, 141). The information regarding the stranger who appeared at Mr. Medley's hotel room the next day asking about Ms. Steinbrecker and about drugs was never revealed until the second trial, all of which the prosecutor pointed out. (*Id.* at 153).

[3] In rebuttal, Ms. Lambert testified she did not discover Ms. Steinbrecker's body nor did she have any interaction whatsoever with Mr. Medley until late at night on May 30, 1995. (RR, vol. 7 189-90). Ms. Steinbrecker's son, Mr. Douglas, additionally testified on rebuttal that he observed his mother leave with Mr. Medley at approximately 6:30 p.m. on the day of her death. (*Id.* at 197). This put Mr. Medley with the victim, still alive, one hour after Ms. Lambert, according to Medley, purportedly approached Mr. Medley with the revelation of her discovery of Ms. Steinbrecker's body in Mr. Medley's hotel room. (*Compare id.* with *id.* at 63, 123).

second trial was voluntary, and the Court agrees with respondent's contention that no error occurred. The state court rulings were not contrary to clearly established federal constitutional law nor did they constitute an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d).

## 2. Retroactively Applying Case Law

Petitioner contends the trial court violated his Sixth Amendment rights when it allowed testimony from the first trial to be used to impeach his testimony in the second trial and that this entitles him to federal habeas corpus relief. While this Court views Medley's claim to be more of a Fifth Amendment issue of coerced testimony than a Sixth Amendment issue of denial of counsel, petitioner has classified his first ground as a Sixth Amendment claim, and the Court will discuss it as such, but it will also give due consideration to petitioner's Fifth Amendment contentions presented in grounds 3, 4, and 5.

The 2009 Supreme Court opinion of *Kansas v. Ventris*, 556 U.S. 586, 129 S.Ct. 1841, 173 L.Ed.2d 801 (2009), if applicable, is instructive on petitioner Medley's Sixth Amendment claim. In *Ventris*, a defendant who had invoked his right to counsel confessed to a jailhouse informant. *Id.* at 589, 129 S.Ct. at 1844. At trial, the defendant took the stand and testified he had not committed the crime of which he was accused. *Id.*, 129 S.Ct. at 1844. The State called the jailhouse informant to impeach the defendant. *Id.*, 129 S.Ct. at 1844. The Supreme Court held, "the informant's testimony, concededly *elicited in violation of the Sixth Amendment*, was admissible to challenge Ventris's inconsistent testimony at trial." *Id.* at 594, 129 S.Ct. at 1847 (emphasis added). Thus, under *Ventris*, there was no error in using Medley's testimony from the first trial to impeach him at the second trial even if the testimony from the first trial was elicited in violation of the Sixth Amendment. *See id.* at 594, 129 S.Ct. at 1847. Under Sixth Amendment considerations, *Ventris*, if applicable, clearly precludes petitioner's claim in his first ground. The key is whether *Ventris* is applicable.

In *Teague v. Lane*, 489 U.S. 288, 301, 109 S.Ct. 1060, 1070, 103 L.Ed.2d 334 (1989) (plurality opinion), the Supreme Court created the foundation of a framework to be used in determining whether a rule announced in an opinion should be applied retroactively.[4]   In the three-step process, the reviewing court must first "ascertain the date on which the defendant's conviction and sentence became final."  *Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994).

Next in the *Teague* analysis, the court must "[s]urve[y] the legal landscape as it . . . existed" on the date the conviction and sentence became final.  *Id.*, 114 S.Ct. at 953 (quoting *Graham v. Collins*, 506 U.S. 461, 468, 113 S.Ct. 892, 898, 122 L.Ed.2d 260 (1993)).  During this prong of the analysis the court must determine whether the rule announced in the new Supreme Court opinion is an old rule or a new rule.  *Id.*, 114 S.Ct. at 953.  "Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review."  *Whorton v. Bockting*, 549 U.S. 406, 414, 127 S.Ct. 1173, 1179, 167 L.Ed.2d 1 (2007).  Under *Teague*, a new rule is one in which the result was not "dictated by precedent existing at the time defendant's conviction became final."  *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070.  A new rule "breaks new ground" or "imposes a new obligation on the States or the Federal Government."  *Id.*, 109 S.Ct. at 1070.  "A decision establishes a new principle of law 'either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed.'" *Battie v. Estelle*, 655 F.2d 692, 697 (quoting *Chevron Oil*

---

[4]  The *Teague* framework is traditionally utilized by petitioners seeking to benefit from a recent Supreme Court decision.  Here, petitioner Medley seeks, in effect, to do the opposite, i.e., he seeks to *avoid* the harm that would be caused to his case by the application of *Ventris*.  There appears to be no reasoning in the *Teague* opinion or in subsequent cases that would lead a court to conclude the framework is only applicable to petitioners seeking to benefit from a decision and not applicable with equal force to petitioners seeking to avoid the implications of a decision.  The undersigned will comply with the *Teague* framework in analyzing petitioner's claim without reaching the decision of whether *Teague* is in fact applicable to a petitioner seeking to avoid retroactive application of a decision.  Even outside that framework, however, and without giving any force to *Ventris*, petitioner's argument would fail because (as set forth *infra*) the trial court's ruling allowing the State to use testimony from the first trial to impeach petitioner at the second trial was correct based upon pre-*Ventris* case law.

*v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971)).

While new rules are generally not retroactively applicable, there are instances in which a court can apply a new rule retroactively. Thus, in the third stage of *Teague* analysis, the reviewing court is to decide whether the new rule meets the requirements of one of these exceptional instances, i.e., whether it is (1) substantive or (2) a "'watershed rule[] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 1264, 108 L.Ed.2d 415 (1990) (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. at 1076).

### 3. The Retroactive Applicability of *Ventris*

It is undisputed that petitioner Medley's conviction, which became final in 2005 when the Supreme Court denied his petition for a writ of certiorari, was final long before *Ventris* issued. *See Medley v. Texas*, 546 U.S. 1002, 126 S.Ct. 621, 163 L.Ed.2d 504 (2005); *Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). Under *Teague*, then, this Court must next inquire whether the rule announced in *Ventris* was new. *See Caspari*, 510 U.S. at 390, 114 S.Ct. at 953.

Prior to *Ventris*, the Supreme Court was faced with other situations in which unconstitutionally obtained evidence was used to impeach a defendant. The Supreme Court has a long and consistent history of allowing such evidence to be used for impeachment. In *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed.2d 502 (1954), the Court was faced with the use of evidence obtained in violation of the Fourth Amendment for purposes of impeaching the defendant. *Id.* at 64, 74 S.Ct. at 355. The Court allowed the introduction of the evidence, holding,

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained.  It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

*Id.* at 65, 74 S.Ct. at 356.

The Supreme Court continued its application of this principle in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).  In that case, the Supreme Court dealt with statements made by a defendant in violation of his Fifth Amendment *Miranda* rights.  The State later used those statements to impeach the defendant at trial.  *Id.* at 223-24, 91 S.Ct. at 644-45.  The Supreme Court allowed the use of the unconstitutionally obtained statements.

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.  But that privilege cannot be construed to include the right to commit perjury.  Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process . . . The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.

*Id.* at 225-26, 91 S.Ct. at 645-46 (internal citations omitted).

The Court was again faced with the use of ill-gotten statements to impeach a defendant in *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).  In that case, the defendant invoked his Sixth Amendment right to counsel.  *Id.* at 346, 110 S.Ct. at 1178.  He later waived that invocation and gave a statement to the police.  *Id.*, 110 S.Ct. at 1178.  When the defendant's testimony at trial differed from the statement he had given to police after waiving his right to counsel, the prosecution used the police statement to impeach the defendant.  *Id.* at 346-47, 110 S.Ct. at 1178.  Even though the defendant had waived his invocation of his right to counsel, the Supreme Court dealt with the case as one involving statements given in violation of the Sixth Amendment.  *Id.* at 351, 110 S.Ct. at 1181.  The Supreme Court stated, "[t]he prosecution must not be allowed to build its case against a criminal defendant with evidence acquired in contravention of

constitutional guarantees and their corresponding judicially created protections.  *But use of statements so obtained for impeachment purposes is a different matter.*"  *Id.* at 349, 110 S.Ct. at 1180 (emphasis added).  Citing *Harris*, the Court reiterated "we have *consistently* rejected arguments that would allow a defendant to 'turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.'"  *Id.* at 350, 110 S.Ct. at 1180 (citing *Harris*, 401 U.S. at 224, 91 S.Ct. at 645) (emphasis added)

This was the rule of law for over half of a century when *Ventris* was considered.  The Supreme Court recognized this fact, stating in *Ventris*, "[w]e have held *in every other context* that tainted evidence—evidence whose very introduction does not constitute the constitutional violation, but whose obtaining was constitutionally invalid—is admissible for impeachment."  *Ventris*, 556 U.S. at 594, 129 S.Ct. at 1847 (emphasis added).  Given this legal landscape, the result in *Ventris* did not break new ground or impose new obligations.  *See Teague*, 489 U.S. at 301, 109 S.Ct. at 1070.  It did not overrule past precedent.  *See id.*  To the contrary, any other holding in *Ventris* would have been a break from not only past precedent but from legal anchors of law first established in 1954 and consistently relied upon since that time.  *See Michigan*, 494 U.S. at 350, 110 S.Ct. at 1180; *Harris*, 401 U.S. at 225-26, 91 S.Ct. at 645-46; *Walder*, 347 U.S. at 65, 74 S.Ct. at 356.  The holding in *Ventris* was "clearly foreshadowed," s*ee Battie*, 655 F.2d at 697, and to the extent any holding of the Supreme Court can be "dictated," the holding in *Ventris* was certainly "dictated by precedent existing at the time [Medley's] conviction became final."  *See Teague*, 489 U.S. at 301, 109 S.Ct. at 1070.  Consequently, the rule announced by *Ventris* was not new.  *See id.*, 109 S.Ct. at 1070.  Instead, it was an "old rule" and therefore is applicable both on direct and collateral review.  *See Bockting*, 549 U.S. at 414, 127 S.Ct. at 1179.  Having found the rule announced in *Ventris* to be an old rule, any analysis of *Teague's*

third prong is unnecessary.[5]  *See Saffle*, 494 U.S. at 495, 110 S.Ct. at 1264 (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. at 1076).

Petitioner avers "*Ventris* announced a new constitutional rule of criminal procedure, and . . . the finding that the Sixth Amendment violation occurs before trial, rather than at trial, is a clear break from past Sixth Amendment jurisprudence which could not have been reasonably predicted." ("Petitioner's Motion to Bar Application of New Constitutional Rule of Criminal Procedure," doc. 100, pg. 5 (filed Apr. 10, 2012)).[6]  This contention misses the mark.  The part of the *Ventris* holding regarding *when* a Sixth Amendment violation occurs[7] is not the relevant portion of that opinion insofar as Medley's

---

[5]  Similarly, in *In Re King*, 697 F.3d 1189 (5th Cir. 2012), the Fifth Circuit held the rules of law announced by the Supreme Court in *Lafler v. Cooper*, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012) and *Missouri v. Frye*, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012) were not new because they were dictated by *Strickland*.

[6]  Petitioner Medley, in these proceedings, attempts to use motions, such as the one referenced, to advance additional briefing on the merits of his claims.  Petitioner's brief in support of his habeas claim is twenty-five pages long, not counting the table of contents and table of authorities, which is the maximum length of pages allowed under this Court's rules.  *See* Local Rule 7.2(c).  This brief is in addition to the required form habeas corpus petition itself, which petitioner also supplements by inserting additional pages into the form.  In addition to the petition, the brief in support of the petition, portions of the appendix to the petition which advance additional arguments on the merits of the habeas claims, and petitioner's response to respondent's answer, petitioner has filed at least six motions advancing at least 116 pages of additional arguments on the merits of petitioner's claims.  (*See* "Petitioner's Motion to Stay (or Extend) Time to Filed Petitioner's Reply to Respondent's Answer," doc. 99 (Apr. 2, 2012); "Petitioner's Motion to Bar Application of New Constitutional Rule of Criminal Procedure," doc. 100 (Apr. 10, 2012); "Petitioner's Motion to Conduct Plenary Review of His § 2254 Habeas Claims with Brief in Support," doc. 121 (Nov. 20, 2012); "Petitioner's Motion for Evidentiary Hearing with Brief in Support," doc. 122-1 (Feb. 5, 2013); "Petitioner's Motion for Leave to File 'Petitioner's Expoundment of Habeas Ground Nine with Brief in Support,'" doc. 129 (June 10, 2013); "Petitioner's Expoundment of Habeas Ground Nine with Brief in Support," doc. 129-1 (June 10, 2013)).  This calculation does not include any table of contents, table of authorities, or appendices involved with many of these so-called motions.  Petitioner seeks to incorporate the arguments in each subsequent motion, all of which directly address the merits of his habeas corpus claims, into the petition itself for additional consideration.  Petitioner was at the page limit when he filed his brief.  Additional briefing on the merits was not permitted under the rules of this Court without permission from the Court.  While petitioner sought and obtained permission to exceed the Court's page limitation in his response to respondent's answer, he attempts to eviscerate the Court's page limit restriction with these many additional briefs.  *See Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993) (holding a petitioner may not incorporate by reference arguments in other pleadings).  Petitioner's continued attempted end-runs around the Court's page limit rules is not only abusive but has substantially interfered with the adjudication of this case.

[7]  Moreover, the portion of the *Ventris* holding concerning when a Sixth Amendment violation occurs was not a "clear break" from precedent.  In *Ventris*, the Court did call the *Massiah* opinion "equivocal on what precisely constituted the [Sixth Amendment] violation."  *Ventris*, 556 U.S. at 592, 129 S.Ct. at 1846.  It then went on not to abrogate any portion of *Massiah* but rather to expound on the rule established in *Massiah*:  "the *Massiah* right is a right to be free of uncounseled interrogation, and is infringed at the time of the interrogation."  *Id.*, 129 S.Ct. at 1846.

case is concerned.

### 4. Petitioner's Claim Fails Regardless of *Ventris*

Even if *Ventris* had not been decided or did not apply, Medley cannot demonstrate entitlement

to habeas relief. Petitioner was admonished before he testified that the State might use testimony given

in the first trial to impeach him at the second trial. (RR, vol. 7, pg. 53-54). Petitioner repeatedly

highlights comments made by the trial court that the court itself described as against good judicial

discretion and not very prudent. Those comments, however, were made when the trial court ruled

favorably for Medley, holding the testimony from the first trial *could not* be use in the second trial.

(*Id.* at 83-84). Petitioner seeks to rely upon these statements by the trial court to show error, but he

ignores or minimizes the impact of the trial court's subsequent hearing to determine the voluntariness

of petitioner's testimony from the first trial; the court's finding such testimony was voluntary; and then

the court's ultimate decision to allow the impeachment evidence, which determination was, as recited

by the trial court, made after briefing and based upon the existing federal constitutional cases of *Harris*

*v. New York* and *Michigan v. Harvey*. (*Id.* at 110). Both of these cases established statements obtained

in violation of the Constitution are admissible for impeachment purposes, and petitioner has failed to

show how the trial court's analysis in reaching that result was flawed or otherwise contrary to the law

in effect at that time, much less unreasonable. *See* 28 U.S.C. § 2254(d).

Lastly, even if it were error to allow the prior testimony for impeachment, any such error would

have been harmless. *See Satterwhite v. Texas*, 486 U.S. 249, 257, 108 S.Ct. 1792, 1798, 100 L.Ed.2d

284 (1988) (stating "[w]e have permitted harmless error analysis . . . where the evil caused by a Sixth

Amendment violation is limited to the erroneous admission of particular evidence at trial"). The trial

court specifically instructed the jury that the evidence was for impeachment only and could not be

considered "as tending to establish the alleged guilt of the defendant." (CR #2, vol. 1, pg. 104).

Moreover, the rebuttal testimony of Ms. Lambert and Mr. Douglas was extremely damaging to Medley's story as both of those witnesses unwaveringly contradicted petitioner's testimony. That rebuttal testimony was arguably much more damaging than the prosecutor's impeachment of petitioner. Petitioner has again failed to show how the state court decision upholding the trial court's determination to allow testimony from the first trial to be used for his impeachment at the second trial was contrary to clearly established federal constitutional law or was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). His first ground asserting a Sixth Amendment violation is without merit.

### B.  Double Jeopardy Violation

In his second ground, Medley contends the trial judge and the prosecutor knowingly and intentionally committed error in the first trial, making the second trial violative of the Double Jeopardy Clause.

The Double Jeopardy Clause found in the Fifth Amendment protects a defendant from being "twice put in jeopardy of life or limb." Thus one of the rights afforded by this clause is protection against a second prosecution for the same offense after acquittal. The Clause does not, however, automatically protect a defendant from reprosecution after a conviction is overturned on appeal. *Boston Mun. Court v. Lydon*, 466 U.S. 294, 308, 104 S.Ct. 1805, 1813, 80 L.Ed.2d 311 (1984).

> Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.

*United States v. Tateo*, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964).

Thus, in *Price v. Georgia*, 398 U.S. 323, 326, 90 S.Ct. 1757, 1759, 26 L.Ed.2d 300 (1970), the Supreme Court recognized the concept of "continuing jeopardy." This principle "has application

where criminal proceedings against an accused have not run their full course." *Id.*, 90 S.Ct. at 1759. While acquittals or a reversal of a conviction based upon the reviewing court's determination that the evidence was legally insufficient will terminate the initial jeopardy and bar a second trial, *Id.*, 90 S.Ct. at 1761; *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150-51, 57 L.Ed.2d 1 (1978), such a bar to re-prosecution will not exist where the accused successfully seeks review of a conviction for trial error. There is no double jeopardy upon a new trial because the initial jeopardy has not terminated. *Francis v. Resweber*, 329 U.S. 459, 462, 67 S.Ct. 374, 375, 91 L.Ed.2d 422; *see United States v. DiFrancesco*, 449 U.S. 117, 131, 101 S.Ct. 426, 434, 66 L.Ed.2d 328 (1980) (internal quotation omitted) (stating "if the first trial has ended in a conviction, the double jeopardy guarantee imposes no limitations whatever upon the power to retry a defendant who has succeeded in getting his first conviction set aside").

> In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case . . . Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect . . . When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished.

*Burks*, 437 U.S. at 15, 98 S.Ct. at 2149.

At one time, Fifth Circuit jurisprudence held that if there was "prosecutorial overreaching" in the first trial and the defendant successfully sought a mistrial, a second trial was barred by the Double Jeopardy Clause. *United States v. Kessler*, 530 F.2d 1246 (5th Cir. 1976). That case law was expressly disavowed by the Fifth Circuit in *United States v. Singleterry*, 682 F.2d 122, 123 n.1 (5th Cir. 1982). In *Singleterry*, the court, quoting *Oregon v. Kennedy*, 456 U.S. 667, 675-76, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982), stated: "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy

Clause." 682 F.2d at 123 n.1. The prosecutor intentionally aims to subvert the protections afforded

by the Double Jeopardy Clause when he or she means to "goad" the defendant into attempting to

obtain a second trial. *See Kennedy*, 456 U.S. at 676, 102 S.Ct. at 2089; *United States v. ElMezain*, 664

F.3d 467, 561 (5th Cir. 2011). Thus, the Supreme Court has traditionally focused the analysis not on

the intentions of the prosecutor so much as on the actions of the defendant: "[t]he important

consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control

over the course to be followed in the event of [prosecutorial] error." *United States v. Dinitz*, 424 U.S.

600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976).

    In this case, petitioner Medley successfully appealed his first conviction, and that conviction

was overturned based upon a claim of denial of the right to counsel. Initial jeopardy never terminated,

and the second trial, following reversal, was not prohibited by the Double Jeopardy Clause.[8] *See*

*Burks*, 437 U.S. at 15, 98 S.Ct. at 2149.

    Petitioner, however, relying upon the disavowed *Kessler* opinion, avers,

> The Judge and Prosecutor used the first trial as a means of oppression -- to harass,
> retaliate, increase the likelihood of conviction, and to humiliate the Petitioner for
> exercising his Sixth Amendment right to self-representation during pre-trial
> proceedings, while aware of the fact that denying Petitioner's invoked right to Trial
> Counsel (without justification) would result in multiple trials for the same offense.

("Petitioner's Brief," doc. 2, pg. 9 (filed Mar. 21, 2007)). First, Medley's claim has no factual support.

It is completely based upon conclusory and bald assertions regarding the unspoken and otherwise

undocumented intentions of the trial judge and the prosecutor. There is no record evidence to support

petitioner's allegations, and petitioner's statements, standing alone, are insufficient and do not form

---

    [8] Petitioner states "[t]he 'continuing jeopardy' concept has never been adopted by the majority of the U.S. Supreme Court." ("Petitioner's Brief," doc. 2, pg. 16 (filed Mar. 21, 2007)). To the contrary, in *Price*, a unanimous case with one justice not taking part, the Supreme Court recognized that the opinion in *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed.2d 300 (1896), which was also unanimous, "effectively formulated a concept of continuing jeopardy." 398 U.S. at 326, 90 S.Ct. at 1759.

a basis for habeas relief. *See Ross v. Estelle*, 695 F.2d 1008, 1011 (5th Cir. 1983) (holding "[a]bsent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition . . . unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value").

Additionally, and as set forth above, the case law petitioner cites has been expressly abrogated by the Fifth Circuit. *See Singleterry*, 682 F.2d at 123 n.1; *Kessler*, 530 F.2d at 1253.  Under current controlling case law, petitioner's second trial was conducted in violation of the Due Process Clause only if the prosecutor intended to goad petitioner into appealing the case and obtaining a second trial. *See ElMezain*, 664 F.3d at 561.  Medley has presented nothing indicating such was the prosecutor's intentions.  During the first trial, petitioner was appointed an attorney.  Both petitioner and the appointed attorney asked that the attorney be allowed to withdraw from the case. (*State v. Medley*, No. 35,170-C, "Clerk's Record" (from the first trial), vol. 1, pgs. 8, 25 (251st Dist. Ct. of Potter Cty., Tex., May 28, 1997)).  Petitioner Medley then sent the trial court pro se pleadings, including a letter indicating he wanted to enter a plea of no contest.  (*Id.* at 18).  The court then removed the first attorney from the case and appointed a second attorney to represent Mr. Medley.  (*Id.* at 28).  The second attorney filed a number of motions, including a motion requesting a psychiatric evaluation of petitioner.  (*Id.* at 53).  As discussed in more detail *infra*, even though the trial court granted that motion, petitioner refused to communicate with the doctor, making the examination impossible.  (*Id.* at 59).  Then at a pretrial hearing, petitioner indicated he wished to represent himself and have his appointed attorney continue to have the ability to make objections.  (*Id.*, Supplemental Record, pgs. 6-7 (Hearing of Oct. 16, 1997)).  The court denied petitioner's request for such hybrid representation but did state it would allow petitioner to represent himself and allow appointed counsel to act as standby counsel.  (*Id.* at 10).  The trial court also indicated petitioner could change his mind regarding

representation, saying, "if at any time you decide that you want [appointed counsel] to represent you, the Court would grant that request." (*Id.* at 31). Petitioner Medley proceeded to represent himself through four pretrial hearings. At the fourth of these hearings, which was on the day trial was scheduled to begin, petitioner indicated he no longer wished to proceed pro se and asked to withdraw his Waiver of Consent and for appointed counsel to step back into the role of lead counsel. (*Id.*, vol. 4, pg. 10 (Apr. 7, 1998)). The trial court denied petitioner's eleventh-hour request, and the trial proceeded with petitioner representing himself.[9]

    Petitioner complains of the prosecutor's inaction in making sure petitioner could be represented by an attorney at the trial. The above-detailed history, however, in combination with the fact that the prosecutor was representing the State and not petitioner, and together with the fact that it was not the prosecutor but the judge who decided whether petitioner could receive the assistance of standby counsel shows there is no basis to conclude the prosecutor acted in a harassing or overreaching manner, much less that he did so with the intent to subvert petitioner's rights under the Double Jeopardy Clause. *See ElMezain*, 664 F.3d at 561.

    Furthermore, the prosecutor would have had nothing to gain by having the case reversed on appeal. The State's theory of the case and the direction of evidence in support of that theory was consistent at both trials. The biggest difference in the evidence presented in the two trials came from

---

[9] At that trial, and before Mr. Medley made his opening statements or took the stand, the trial judge stated, "as I understand it, you have a desire to present your side of the story that you don't feel would be presented if [standby counsel] were to represent you. Is that a fair statement?" (*State v. Medley*, No. 35, 170-C, "Reporter's Record", vol. 6, pg. 182 (Apr. 7, 1998)). Mr. Medley responded, "[t]hat's fair." (*Id.*). Standby counsel additionally indicated, "[t]hat's a fair statement, Your Honor." (*Id.*). The court recessed for lunch. (*Id.* at 185). When it reconvened, the trial judge told the jury, "[a]t this time, the Defense has the opportunity, but is under no requirement, to present testimony." (*Id.*). The trial judge then asked Mr. Medley if he would like to make an opening statement, which Mr. Medley did. (*Id.*). During his opening statement, Mr. Medley stated, "I got [standby counsel], he was appointed to me. I told him what happened, that I wanted to tell what happened. And he -- but he knows it's not in the best interest of my defense to come forward and say -- to give my testimony." (*Id.* at 192). He went on to state, "another reason why I'm representing myself [is] to make sure that I would be able to give my testimony." (*Id.* at 193).

petitioner himself, whose version of the events changed in several key aspects between the first and second trial. Between the first and second trials, the prosecution gained very little advantage, and petitioner gained a considerable advantage, reflected by a decrease in sentence from a life sentence down to a forty-year sentence. Not only is there no record evidence supporting petitioner's contention, but the contention itself is not credible. *See Kennedy*, 456 U.S. at 676, 102 S.Ct. at 2089. Petitioner retained control over the appeal and reversal of his first conviction, and the Double Jeopardy Clause was not violated by the second trial which followed petitioner's successful appeal. *See DiFrancesco*, 449 U.S. at 131, 101 S.Ct. at 434; *Dinitz*, 424 U.S. at 609, 96 S.Ct. at 1080.

## C. *Self-Incrimination Violation*

In his third, fourth, and fifth grounds, petitioner complains the testimony from the first trial used to impeach him at the second trial was coerced in violation of his Fifth Amendment privilege against self-incrimination, and was impelled, respectively. Petitioner draws a distinction between "coerced" testimony (in his third ground), "compelled" testimony (in his fourth ground), and "impelled" testimony (in his fifth ground). While case law does appear to draw a distinction between "compelled" and "impelled" testimony, it does not appear to draw any distinction between "compelled" and "coerced" testimony. *See New Jersey v. Portash*, 440 U.S. 450, 463, 99 S.Ct. 1292, 1299, 59 L.Ed.2d 501 (1979) (indicating that coercing a defendant to testify at trial results in compelled testimony for Fifth Amendment analysis purposes); *Ashcraft v. State of Tenn.*, 322 U.S. 143, 154 n. 9, 64 S.Ct. 921, 926 n. 9, 88 L.Ed.2d 1192 (1944) (using "compelled" and "coerced" interchangeably). Consequently, because case law impacting the arguments presented in the third and fourth grounds are closely linked, the Court will address those contentions together.

### 1. Petitioner's Trial Testimony was Neither Coerced nor Compelled

In his third ground, petitioner avers the "[p]rosecutor used voir dire in the first trial to

psychologically coerce Petitioner into giving statements." ("Petitioner's Brief," doc. 2 at 17).  By this claim it appears petitioner is contending he was emotionally unstable and not thinking clearly at the first trial when he testified and made the statements that were later used to impeach him at the second trial.  Petitioner continues in his fourth ground of error, "breaking all the way down, Petitioner testified in accordance to [sic] the State's witnesses, to end the tortuous trial as quickly as possible."  (*Id.* at 21).  The substance of petitioner's argument is not at all clear.

The evidence from the first trial indicates petitioner was told on several occasions of his right not to testify.  On October 16, 1997 (almost six months before the trial), the trial court held a hearing on petitioner's request to represent himself.  (*State v. Medley*, No. 35, 170-C, "Reporter's Record," Supp. Vol., "Pretrial Hearing" (Oct. 16, 1997)).  At that hearing, the trial court told Mr. Medley, "you understand that you have a right to remain silent, no one could compel you to testify against your interest," to which Mr. Medley answered, "[y]es, Your Honor."  (*Id.* at 15).  At that time, the trial court additionally admonished Mr. Medley, "You understand that, technically, the jury should make its decision based upon the sworn statement of a witness given under oath?  You may or may not choose to call yourself as a witness."  (*Id.*).  Defendant answered, "Yes, Your Honor."  (*Id*. at 16).  Further evidence of Medley's knowledge of his Fifth Amendment rights is that at a March 20, 1998 pretrial hearing the trial court discussed Mr. Medley's refusal to speak with a psychiatrist at a court-ordered competency evaluation.  (*Id.*, "Reporter's Record," vol. 3, "Pretrial Proceedings," pgs 13-14 (Mar. 20, 1998)).  Mr. Medley based his refusal to speak with the doctor on his Fifth Amendment privilege, which the trial court accepted.  (*Id.* at 14).  Then, on April 6, 1998, the day before the trial began, defendant filed a letter with the trial court in which he stated that he waived his right to remain silent. (*Id.*, "Clerk's Record," vol. 1, "Petition for Federal Investigation," pgs. 168, 170 (Apr. 6, 1998)).

At the first trial, in its opening statements to the jury, the trial court told the jury that at the close of the State's case-in -chief, "the Defendant has the opportunity to present testimony should the Defendant choose.  The Defendant is under no obligation to do so and has no burden in this case." (*Id.*, "Reporter's Record," vol. 6, "Guilt-Innocence Phase," pg. 4 (Apr. 7, 1998)).  Immediately before the defense's case-in-chief, the court again said, "[a]t this time, the Defense has the opportunity, but is under no requirement, to present testimony."  (*Id.* at 185).  After his opening statement, the court indicated Mr. Medley could call his first witness.  (*Id.*).  Mr. Medley said, "I have no witness other than what the State called, Your Honor." (*Id.* at 194).  In response the trial judge stated, "Mr. Medley, you understand and I have instructed the jury that all of the statements that you've made here in opening statement are not evidence and may not be considered by them in determining your guilt or innocence.  If you want the jury to be able to consider those allegations, then you're going to have to testify and that's a right that you have to testify or to not testify.  But you need to understand that your opening statement is not any evidence." (*Id.*).  After a recess during which he conferred with standby counsel, Mr. Medley stated that he wished to testify.  (*Id.* at 195-97).

At the beginning of his testimony, in the presence of the jury and after being sworn, the court stated, "Mr. Medley, first of all, you understand that you do have a right to remain silent.  No one can compel you to testify against your interest.  Are you freely and voluntarily testifying here?"  (*Id.* at 197).  Mr. Medley responded, "I am, Your Honor."  (*Id.*).  At that point, Mr. Medley took the stand and offered his testimony of how he discovered Ms. Steinbrecker's body and disposed of it, but had nothing to do with her murder.

At the second trial, the trial court, before allowing any impeachment of Medley using the testimony he gave at the first trial, conducted a hearing regarding Mr. Medley's testimony at the first trial.  The following occurred between Medley and the prosecutor at that hearing:

Q.      At some point in the trial, you testified?

A.      That's correct.

Q.      And you made that decision to testify; is that correct?

A.      I feel that it was forced.

. . .

Q.      Who forced you to get up there?

A.      With respect to this Court, Judge Pirtle.

Q.      Judge Pirtle made you get out of your stand and walk up there?

A.      It was the only way to present a defense.

Q.      Do you recall him advising you prior to you getting up there that you did not have to testify?

A.      Yes.

Q.      So, he told you you didn't have to testify?

A.      Yes.

Q.      And he told you that you had a right not to testify?

A.      Yes.

Q.      And that that would be your decision whether or not to testify or not?

A.      I don't recall him saying that.

. . .

Q.      You could just sit there and not say anything at all?

A.      Yeah, I could sit there and have no defense, yes.

. . .

Q.      . . . you made the decision to testify.  Anybody beat you?

A.      Not physically, no.

Q.      Did they drag you up there on the witness stand?

A.      No, I just feel that it was forced testimony.

Q.      Did they drag you up there on the witness stand?

A.      No, they did not.

Q.      Did members of your family tell you that you had to get up there on the witness stand?

A.      No, they did not.

Q.      Did I tell you you had to get up there on the witness stand?

A.      No, you didn't.

Q.      Did Judge Pirtle say, "Mr. Medley, you have to testify"?

A.      Well --

Q.      Did he, in so many words, tell --

A.      I believe he did.

Q.      He told you that you had to testify?

A.      For -- for my, uh, opening statements to --

Q.      Well, because you understand that your opening statement is not evidence, and we're not talking about your opening statements.

A.      That's what I was talking about.  My -- I made my opening statement and I believe that the Judge told me that the jury would disregard [it] if I didn't, uh, testify under oath, that they would disregard my opening testimony.

Q.      You understand that that's the case in every trial?

. . .

A.      I'm really not that knowledgeable.

(RR, vol. 7 at 94-98).

"The Fifth Amendment guarantees that no person shall be compelled to give evidence against himself, and so is violated whenever a truly coerced confession is introduced at trial, whether by way of impeachment or otherwise." *Ventris*, 556 U.S. at 590, 129 S.Ct. at 1845 (citing *Portash*, 440 U.S. at 458-59, 99 S.Ct. at 1297 ).  In the same vein, "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law." *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978).

The question becomes whether the challenged statements constitute "a truly coerced confession." *Ventris*, 556 U.S. at 590, 129 S.Ct. at 1845.  "[T]he ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450-51, 88 L.Ed.2d 405 (1985).  In determining whether a statement was violative of the Fifth or Fourteenth Amendment, the Supreme Court has consistently held "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Id.* at 116, 106 S.Ct. at 452-53.  The Fifth Circuit has described inappropriate techniques for obtaining statements as "*third-degree* physical or psychological coercion." *United States v. Fredericks*, 586 F.2d 470, 481 (5th Cir. 1978) (emphasis added).

Conversely, when a defendant voluntarily takes the stand and testifies, he waives his Fifth Amendment privilege against self-incrimination as to the testimony he gives.  If, during the course of his testimony, he is asked a question covered by the Fifth Amendment's protections, he must assert his Fifth Amendment privilege at that time.  *See Minnestoa v. Murphy*, 465 U.S. 420, 434, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409 (1984).  "If a defendant desires the protection of the [Fifth Amendment]

privilege, he must claim it or his statements will not be considered 'compelled' within the meaning of the Fifth Amendment." *United States v. Locke*, 482 F.3d 764, 767 (5th Cir. 2007). Of course, this rule does not apply if "assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and . . . compe[l] . . . incriminating testimony.'" *Murphy*, 465 U.S. at 434, 104 S.Ct. at 1146 (quoting *Garner v. United States*, 424 U.S. 648, 661, 96 S.Ct. 1178, 1186, 47 L.Ed.2d 370 (1976)). Such "penalty cases" occur when the State threatens economic or other sanctions if a witness refuses to testify. *Id.*, 104 S.Ct. at 1146. The general rule remains, however:

> A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.

*Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968).

The evidence in this case simply does not support Mr. Medley's contention that his will was overborne to the degree his testimony in the first trial was given in violation of his Fifth Amendment privilege against self-incrimination. He was told months before his trial and was told again during the trial itself that he did not have to testify. In fact, Medley successfully asserted his Fifth Amendment privilege during a court-ordered mental examination, contending that forcing his participation in the examination would violate his Fifth Amendment rights. (*State v. Medley*, No. 35,170-C, "Reporter's Record," vol. 3, "Pretrial Proceedings," pgs. 13-14 (Mar. 20, 1998) (trial court stating, "I believe that you were taken to see [a court-appointed psychiatrist] and at that time exercised your privilege under the Fifth Amendment to not discuss anything with [the doctor]?" Medley responded, "That's correct, Your Honor."). Further, in his handwritten letter to the trial court, filed the day before the trial began, he stated he was waiving his right to remain silent. Based upon the discussion between Medley, his

standby counsel, and the trial court,[10] it appears Medley wanted to testify so he would be able to tell

his version of the events to the jury.  The fact that Mr. Medley wanted to tell his side of the story to

the jury in order to present a defense does not render his testimony either "coerced" or "compelled."[11]

*See Harrison*, 392 U.S. at 222, 88 S.Ct. at 2010.

Furthermore, the trial court stated to the jury on two different occasions before Mr. Medley

took the stand that Mr. Medley did not have to present any testimony.  (*State v. Medley*, No. 35-170-C,

"Reporter's Record," vol. 6, "Guilt-Innocence Phase," pgs. 4, 185 (Apr. 7, 1998)).  The trial court

---

[10]   Before Medley presented his case-in-chief at the first trial, the trial court stated "as I understand it, you
have a desire to present your side of the story that you don't feel would be presented if [standby counsel] were to
represent you.  Is that a fair statement?"  (*State v. Medley*, No. 35, 170-C, "Reporter's Record," vol. 6, "Guilt-
Innocence Phase," pg. 182 (Apr. 7, 1998)).  Mr. Medley responded, "[t]hat's fair."  *Id.*  Standby counsel additionally
indicated, "[t]hat's a fair statement, Your Honor."  *Id.*
     At the second trial, during the hearing the trial court conducted to determine the voluntariness of Mr.
Medley's testimony at the first trial, the following exchange occurred between Mr. Medley and the prosecutor:
     Q.      Well, isn't it true you weren't comfortable with [standby counsel] because [standby
             counsel] didn't want to come in here and commit an ethical violation by representing you
             with the testimony you were going to give; isn't that true?
     A.      I believe that that would infringe on attorney-client privilege.
     Q.      . . . I'm not asking what you told him, I'm asking you isn't it true that the reason you
             didn't want [standby counsel] to represent you is because you knew [standby counsel]
             would not ask you the questions so that you could tell the story you wanted to tell; isn't
             that the fact?
     A.      That's part of it.
(RR, vol. 7 at 99-100).

[11]   The American justice system is one based upon oaths:  "A man of the most exalted virtue, though judges
and jurors might place the most entire confidence in his declarations, cannot be heard in a court of justice, without
oath.  This is a universal rule of the common law, sanctioned by the wisdom of ages, and obligatory upon every
court of justice."  *Atwood v. Welton*, 7 Conn. 66 (1828).  Petitioner wanted to offer his side of the story as to what
happened at the time of Ms. Steinbrecker's murder, as he took the stand at both of his trials.  No matter what, if
Medley wanted the jury to hear his version of events, the only way he could present it for the jury's consideration
was under oath, regardless of whether his statements were in response to questions from his attorney or made pro se,
without the assistance of an attorney.  Medley does not like the fact that he was faced with the decision facing every
person accused of a crime in America—he could either not testify and leave the jury ignorant as to his side of the
story or he could testify and give the jury his side of the story.  That petitioner was faced with the decision of
whether to testify does not render his ultimate decision to testify "compelled" as that word is conceived in the
Constitution.  It appears as though the thing compelling petitioner the most was his desire to convey his story to the
jury.  That he was required to do so under oath, and that there were consequences to that decision, i.e., his statements
could later be used to impeach his testimony, is a function of the American system of criminal jurisprudence, not a
violation of it.  Medley attacks the trial court judge for holding him to the basic rules of criminal procedure and rules
of evidence without realizing his attack is really against the system itself, not against the person imposing on him the
requirements of the system.

verified with Mr. Medley, who was under oath at the time, that he was freely and voluntarily testifying. (*Id.* at 197). The self-serving contentions petitioner now makes that he was in error or inaccurate when he made these sworn statements are of little, if any, evidentiary value. *See Baldtree v. Johnson*, 99 F.3d 659, 663 (5th Cir. 1996) (indicating that a dispute rooted in a defendant's claim that he perjured himself at trial is viewed with a great deal of suspicion).

Further, Medley's testimony at the second trial validates this conclusion. Despite his claims otherwise, the Court cannot, and does not, conclude petitioner's trial one testimony was forced. There certainly was not anything remotely approaching the "third-degree" coercion that results in a Fifth Amendment violation. Medley repeatedly contends the trial court told him he had to testify, apparently referring to the trial court's comments after Medley made his opening statement. The trial judge at that point, however, correctly advised Medley that any statements made during Medley's opening statement were not evidence, and if Medley wished for these statements made during the opening to be considered as evidence, he would have to present them in sworn testimony. In his habeas petition, Medley takes the trial judge's comments out of context. Read in its entirety, the record shows the trial court properly advised petitioner of the basic rules of evidence and criminal procedure. The court not only advised Medley that the jury could only give weight to his statements if they were given as proper evidence, i.e., as part of sworn testimony, but also told Medley that he had a right to testify or to not testify. The trial court's conveyance of these basic requirements did not amount to coercion.

Rather, as Medley stated at trial, he chose to testify at the first trial because "[i]t was the only way to present a defense." (RR, vol 7 at 94-98). This rationale is in line with that described in *Harrison* to the extent that just because Mr. Medley felt it necessary to testify in order to present a defense does not mean his testimony was coerced or that the waiver of his Fifth Amendment privilege was somehow invalid. *See Harrison*, 392 U.S. at 222, 88 S.Ct. at 2010. Moreover, it is of note that

petitioner took the stand and testified at his second trial against the advice of his attorney and with knowledge of the possibility that the State could use his testimony from the first trial to impeach his testimony at the second trial.  (RR, vol. 7 at 53-54).

In sum, record evidence supports the conclusion that, under the totality of the circumstances, defendant's decision to testify at both his first and second trials, and the statements he made during his testimony, did not violate the Fifth Amendment.  *See Miller*, 474 U.S. at 112, 106 S.Ct. at 450-51. There is no evidence Mr. Medley's will was overborne in deciding to testify.  *Id.* at 116, 106 S.Ct. at 452-53.  There was nothing approaching "third-degree" coercion inflicted upon him by either the trial court or the prosecution.  *See Fredericks*, 586 F.2d at 481.  In fact, there was no form of sanction or penalty threatened upon Mr. Medley if he decided to not testify.  *See Murhpy*, 465 U.S. at 434, 104 S.Ct. at 1146.

Instead, the evidence supports the trial court's conclusion during the second trial that Medley knowingly and voluntarily waived his Fifth Amendment privilege at the first trial by taking the stand and testifying in his defense.  He never asserted his Fifth Amendment privilege at the first trial, though he had no difficulty asserting the privilege during the pretrial stage of the first trial when the court and Medley's attorney sought to establish Medley's competency.  Importantly, the record does not support the conclusion Mr. Medley had no choice but to testify at the first trial.  *See id*.  Rather, the record supports the conclusion Mr. Medley knowingly waived his privilege against self-incrimination and voluntarily chose to testify because he felt his testimony was the only way he had to present evidence to counter the State's case-in-chief.  That he may have testified as part of his solution to this dilemma did not render Mr. Medley's waiver of his Fifth Amendment privilege any less effective or complete. *See Harrison*, 392 U.S. at 222, 88 S.Ct. at 2010.  Mr. Medley's contention in his third and fourth grounds of error that his testimony at the first trial was compelled, coerced, or otherwise in violation

of the Fifth Amendment is meritless.

## 2.  Petitioner's Trial Testimony was not Impelled

In his fifth ground of error, Mr. Medley contends his testimony at the first trial was "impelled." The "impelled confession" doctrine is used in situations where, at trial, the prosecution presents the jury with evidence of an ill-gotten confession and defendant takes the stand to rebut that evidence.  *See Thompson v. Lynaugh*, 821 F.2d 1054, 1064 (5th Cir. 1987); *Smith v. Estelle*, 527 F.2d 430, 433 (5th Cir. 1976); *Randall v. Estelle*, 492 F.2d 118, 119 (5th Cir. 1974).

The source of the "impelled confession" doctrine appears to be *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).  In that case, the police illegally obtained a confession from the defendant.  *Id.* at 220, 88 S.Ct. at 2009.  At the defendant's first trial, the prosecution introduced that illegal confession.  *Id.*, 88 S.Ct. at 2009.  The defendant took the stand and testified to his own version of events in response to the evidence of his illegal confession.  *Id.*, 88 S.Ct. at 2009.  The first conviction was overturned on appeal.  *Id.*, 88 S.Ct. at 2009.  On remand, the prosecutor did not introduce the tainted confession, but did read portions of defendant's testimony from the first trial to the jury.  *Id.* at 221, 88 S.Ct. at 2009.  The defendant then testified at the second trial in an attempt to overcome the damage done by the introduction of the testimony of the first trial, rebutting the illegally obtained confession.  *Id.* at 222, 88 S.Ct. at 2010.  In overturning the conviction, after the second trial, the Supreme Court held, "the same principle that prohibits the use of confessions [illegally] procured also prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree."  *Id.*, 88 S.Ct. at 2010.  To guide courts in determining whether statements given by a defendant at trial were "impelled," the Court issued the following principle: "The question is not whether the petitioner made a knowing decision to testify, but why. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was

tainted by the same illegality that rendered the confessions themselves inadmissible." *Id.* at 223, 88 S.Ct. at 2010.

With this guidance, Mr. Medley's testimony at the first trial cannot be said to have been impelled.  There was no "illegal confession," and even if Medley did make any incriminatory statements to the police, which were violative of the Fifth Amendment, evidence of any such statement was never introduced.  Mr. Medley did not take the stand at the first trial in order to overcome the impact of the prosecution's introduction of an ill-gotten inculpatory statement.  Because Mr. Medley did not take the stand at the first trial "to overcome the impact of confessions illegally obtained and hence improperly introduced," his testimony was not impelled.  *See id.*, 88 S.Ct. at 2010.

Mr. Medley's testimony at the second trial was likewise not "impelled."  At the second trial, the prosecution did not offer any evidence of an ill-gotten inculpatory statement from Mr. Medley.  The first time the State mentioned any of Mr. Medley's prior trial testimony was only after Mr. Medley testified.  In fact, the admission of Medley's trial one testimony was only in response to his testimony at the second trial, and then only for impeachment.  Thus, at the second trial, like the first, Mr. Medley's decision to testify was not motivated by a need to overcome the impact of an illegally obtained confession.  Consequently, the testimony was not impelled.  *See id.*, 88 S.Ct. at 2010.  The fifth ground of error is meritless.

### D.  Trial Judge Bias

In his sixth ground, petitioner contends the trial judge who presided over both trials was "biased and disqualified," and issued rulings adverse to petitioner at the second trial out of retaliation for petitioner successfully obtaining reversal of the first conviction.

The Supreme Court has candidly said,

The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a

thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings . . . Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant.

. . .

[T]he pejorative connotation of the terms "bias" and "prejudice" demands that they be applied only to judicial predispositions that go beyond what is normal and acceptable.

*Liteky v. United States*, 510 U.S. 540, 550-52, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474 (1994).  The

Court has further established,

[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . *Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* at 555-56, 114 S.Ct. at 1157 (emphasis in original).

Before the State undertook its cross-examination of Mr. Medley in earnest, the trial court conducted a hearing to determine whether the prosecution could use Mr. Medley's statements from the first trial to impeach him at the second.  As detailed above, the trial record shows the trial court fully considered the issue.  The trial judge commented on the ruling of the intermediate state appellate court in overturning the first conviction, indicating his personal disagreement with the decision.  (RR, vol. 7 at 83-84).  The trial judge's initial ruling, however, was in Medley's favor.  (*Id.*).  It was only after briefing that the trial judge revisited the issue, at which point he conducted a hearing at which Mr. Medley was questioned on the subject of whether his testimony at the first trial was knowingly and voluntarily given.  At the conclusion of the hearing, the trial court determined the statements from the first trial "staisf[ied] the legal standards of trustworthiness and [were] usable for purposes of impeachment." (*Id.* at 108-09).

Petitioner now contends the trial judge's bias was demonstrated by this ruling, reasoning the "Judge would have had to hold himself in constitutional and criminal contempt to hold Petitioner's confession was coerced or compelled. Judge's career was in jeopardy had he not prevented acquittal." ("Petitioner's Brief," doc. 2 at 25-26). Petitioner's argument is without substance. Petitioner's responses to the questions asked of him regarding his first trial testimony provided a solid basis for the trial court's determination that Medley's testimony was voluntary. That ruling was not unreasonable and was, in fact, legally sound. Petitioner's contention that the trial judge would have had to hold himself in "constitutional and criminal contempt" to rule otherwise is absurd. Trial judge's are freely able to reconsider their earlier determinations and rule differently, if appropriate, without facing any kind of "contempt." Petitioner's further contention that the trial judge's career would have been in jeopardy had the trial court determined the testimony from the first trial was inadmissible for impeachment at trial two is likewise inaccurate. First, the case had already been reversed on appeal so any purported "damage" that was to be done was already done. Second, as the Supreme Court's decision in *Ventris* demonstrates, the trial judge's ruling was in line both with well-established and upcoming constitutional law and within the dictates of a reasonable factual evaluation. The trial judge's expression of disagreement with the reversal of the first conviction did not amount to a demonstration of bias or prejudice. *See Liteky*, 510 U.S. at 550-52, 114 S.Ct. at 1155. The trial court's ruling on the admissibility of the trial one testimony for impeachment was issued only after legal briefing, argument, and extensive testimony from Mr. Medley. The decision cannot be said to be the result of bias or prejudice.

It is obvious this claim is based upon nothing more than conclusory allegations, unsupported by anything in the record. Such a claim is not cognizable. *See Ross*, 695 F.2d at 1011. Petitioner has not shown the trial judge was predisposed against him. *See Liteky*, 510 U.S. at 550-52, 114 S.Ct. at

1155.  This ground of error is meritless.

### E.  Quality of the Retrial

In his seventh ground, petitioner contends the "retrial failed to purge the unconstitutional taint from the first trial." ("Petitioner's Brief," doc. 2 at 26).  In support of this briefly argued ground, petitioner takes issue with (i) the same judge presiding over both trials, (ii) an unspecified court denying several points of contention "in one swipe," (iii) the State's presentation of additional witnesses and evidence it did not present at the first trial, (iv) the State forcing him to "disclose his entire trial strategy," and (v) the trial court's taking judicial notice during a hearing in the second trial of the record evidence of the first trial.

All of these arguments, as presented, are conclusory.  Respondent addressed this ground simultaneously with the sixth ground of error, and petitioner Medley did not contest such in his reply.  In any event, the brevity of arguments ii. and iv. renders them incapable of discussion—there is simply not enough of a statement or analysis to enable the Court to understand what petitioner is arguing.  Argument i.'s lack of merit was discussed in the analysis of ground number six, above.  Argument iii. was likewise shown meritless in the analysis of ground number two.

In argument v., petitioner challenges the trial court taking judicial notice of the record from trial one (*Id.* at 27).  The following transpired during the hearing regarding the admissibility of petitioner's trial one testimony for impeachment at trial two:

> [The Prosecutor]:  Your Honor, we would also ask the Court to take judicial notice of that first trial and all the proceedings of that trial.
> As the Court will recall, there were numerous hearings prior to the actual jury trial in that case in which the Court discussed with the Defendant his right to counsel, his right to represent himself and the Court also went into great length as to his education, background and the things that he could or could not do in representing himself.
> We believe that the information elicited from the Defendant in that first trial is important because the Court is going to be making a decision as to whether or not the statement in the first trial was, in fact, a voluntary statement.

We would ask the Court to take judicial notice of the Court's own question, his responses in all of those hearings and also consider those in addition to any testimony that's elicited today.

. . .

[Defense Counsel]:  Your Honor, *we would agree*.  We would request that you take notice of the previous hearings.  We especially ask you to refer to the pages where Mr. Medley, just before Mr. Medley starts his testimony and the discussions between the Court and Mr. Medley -- and I'll go into the specific pages later in my argument.

THE COURT:  . . . [T]he Court will take judicial notice, but I'm specifically going to limit it to those matters that were recorded and/or contained in the transcript of the first trial . . .

(RR, vol. 7 at 89-90) (emphasis added).

Thus, both the prosecution *and* defense asked the trial court to take judicial notice of these parts of the record from the first trial which were relevant.  During the "voluntariness" hearing, Mr. Medley's attorney specifically referenced the trial one record in support of his argument.  (*Id.* at 103, 107-08).  Consequently, petitioner used and adopted for his benefit the record he now complains the court took judicial notice of.  Because petitioner asked for the court to take judicial notice of portions of the record from the first trial, Mr. Medley cannot now complain about it.  This ground of error is without merit.

## *F.  Ineffective Assistance of Trial Counsel*

In his eighth ground, petitioner contends he received ineffective assistance of counsel during the second trial in several respects.  First, petitioner contends trial counsel failed to zealously represent him "in order to promote his career -- both out of intimidation of the Judge and to concur [sic] favor with the Judge."  ("Petitioner's Brief," doc. 2 at 27).  Petitioner also avers counsel intentionally did not raise a double jeopardy claim out of concern for the trial judge's and his own careers; did not file a motion to recuse the trial judge because he had experience with the judge (which petitioner contends he later discovered was not true) and did not want to risk the uncertainty of who the new judge would be; threatened to withdraw his representation if petitioner continued to insist on obtaining a new judge;

that he forced petitioner to agree not to testify; refused to file a motion to suppress petitioner's trial one testimony; improperly asserted the suppression claim during the defense's case-in-chief rather than at the pretrial stage; hurt his credibility with the jury through his poorly done voir dire; mishandled the cross-examination of one of the State's witnesses; he failed to call certain witnesses; failed to make an opening statement; failed to impeach Ms. Lambert and attack the quality of the police investigation, as they had agreed to do as a defense strategy; did not fight for petitioner's presence during certain arguments; failed to insist, at petitioner's request, the briefs on the admissibility of trial one testimony be included in the record; allowed the trial judge to compel petitioner's testimony during the hearing regarding the voluntariness and admissibility of the trial one testimony and refused to present the issue to the jury; refused to request the trial judge "tame his biased animation;" failed to request the trial judge admonish the jury to not consider any media reports they had heard prior to trial; failed to present a good closing statement; and met socially with a juror and with the victim's family while representing petitioner.  ("Petitioner's Appendix," doc. 3-3 at 17-20; doc. 3-4 at 1-10 (Mar. 21, 2007)).

The proper standard for judging a petitioner's contention he is entitled to relief on the ground his trial counsel rendered ineffective assistance is enunciated in *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).  Under the two-prong *Strickland* standard, a petitioner must show defense counsel's performance was both deficient and prejudicial. *Id.* at 687, 104 S.Ct. at 2064.  An attorney's performance was deficient if the attorney made errors so serious he or she was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment to the United States Constitution. *Id.*, 104 S.Ct. at 2064.  That is, counsel's performance must have fallen below the standards of reasonably competent representation as determined by the norms of the profession.  A reviewing court's scrutiny of trial counsel's performance is highly deferential, with a strong presumption counsel's performance falls within the wide range of reasonable professional

assistance.  *Id.* at 689, 104 S.Ct. at 2065.

Additionally, a petitioner must show counsel's deficient performance prejudiced the defense. To establish prejudice, a petitioner must show counsel's errors were so serious as to deprive petitioner of a fair trial.  *Id.* at 687, 104 S.Ct. at 2064.  Specifically, to prove prejudice a petitioner must show "(1) there is a reasonable probability that, but for counsel's unprofessional errors, the ultimate result of the proceeding would have been different . . . and (2) counsel's deficient performance rendered the trial fundamentally unfair."  *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998).  "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him."  *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).  A showing of significant prejudice is required. *Spriggs v. Collins*, 993 F.2d 85, 88 n.4. (5th Cir. 1993).

### 1.  Claims Contradicted by the Record

Many of petitioner's statements are belied by the record.  For example, according to petitioner, counsel forced him to agree to not testify at trial.  However, petitioner *did* testify at trial.  No one forced petitioner to remain silent, and in fact petitioner now claims the opposite, i.e., that he was forced to testify.  Petitioner complains counsel refused to file a motion to suppress the trial one testimony. The record shows, however, that counsel vigorously opposed the admission of the trial one testimony. Petitioner complains of counsel's failure to request the trial judge admonish the jury at the beginning of the trial regarding media reports.  The record reflects that at the beginning of the trial, the trial judge *did* admonish the jury to not read any article, listen to any media reports, or allow any other outside influences to enter into their decision making.  (RR, vol. 6 at 2).  All of these claims are directly contradicted by the record and provide no basis for habeas corpus relief.

## 2.  Claims Without Support in the Record

The Court cannot grant habeas corpus relief based upon an allegation without some foundation for it in the record:  "Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition . . . unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value."  *Ross*, 695 F.2d at 1011.  A federal court will not "'blindly accept speculative and inconcrete claims'" as the basis upon which to grant habeas corpus relief.  *West v. Johnson*, 92 F.3d 1385, 1390-1400 (5th Cir. 1996) (quoting *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989)).

Many of petitioner's ineffective assistance of counsel contentions are speculative and lack any factual support.  For example, petitioner's allegation that his attorney failed to zealously represent petitioner out of fear of the trial judge and in order to promote his career and curry favor with the trial judge is speculative and has absolutely no support in the record.  Also speculative is petitioner's assertion that trial counsel did not raise a double jeopardy claim out of concern for the trial judge's and/or his own career.  Petitioner indicates his trial attorney did not follow through with defense strategies upon which the two had agreed.  Any such agreements, however, are not included in the record before the Court.  According to petitioner, counsel threatened to withdraw if petitioner insisted on obtaining a new judge.  Like the previous claims, this allegation is unsupported by the record.  Petitioner also makes several allegations concerning the behavior of the trial judge (for example, petitioner references the trial judge's tone, demeanor, glares, and mouthing words to the attorneys).  He contends his attorney should have requested the judge not be so obvious in his opinions.  None of these unspoken acts, however, are in the record.  Consequently, there is no basis in the record supporting petitioner's argument that counsel should have objected to such alleged acts.  All of these contentions do not provide a sufficient basis upon which the Court could grant habeas corpus relief.

*See id*.; *Ross*, 695 F.2d at 1011.

Finally, petitioner contends trial counsel met socially with a juror and with the victim's family while representing petitioner. While there is no record evidence supporting this contention, Medley attempts to support this argument with an affidavit from a Ms. Judi Edwards. In the affidavit, Ms. Edwards states trial counsel "told me he had drinks at a bar with the victim's family after the verdict." ("Petitioner's Appendix," doc. 3 at 6). The same affidavit was attached to petitioner's state habeas corpus application. (SHCR at 116-17). The affidavit does not provide any details surrounding the meeting—whether it was planned or happenstance, what was discussed, and exactly who was at the meeting. In any event, according to Ms. Edwards, the meeting occurred after the verdict was rendered. Consequently, even if counsel did as alleged there is nothing indicating what prejudice petitioner would have suffered as a result. Petitioner has not shown the state court's determination of this claim was contrary to or involved an unreasonable application of *Strickland* nor that it was an unreasonable determination of the facts based on the evidence in the record. No grounds for federal habeas corpus relief are present. *See* 28 U.S.C. § 2254(d).

### 3. Claims Challenging Counsel's Strategic Decisions

Several of petitioner's claims are based upon his disagreement with some of his trial attorney's strategic decisions. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002). Federal courts must be "highly deferential" in their review of counsel's actions and "must apply a strong presumption that counsel's performance was reasonable or 'might be considered sound trial strategy.'" *United States v. Juarez*, 672 F.3d 381, 386 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2052). Furthermore, "the courts must make 'every effort . . . to eliminate the

distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2052).

Petitioner's claims seek to have the Court do exactly what the case law cited above prohibits, i.e., petitioner asks the Court to second-guess several of counsel's strategic decisions. *See Juarez*, 672 F.3d at 386.  Petitioner challenges counsel's decision to not file a motion to recuse the trial judge. Aside from the fact the record shows no grounds for recusal existed, this would be presumed to be the result of a conscious and informed strategy. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2052. However, it is not necessary to make such a presumption, as petitioner himself indicates counsel made the decision to not seek recusal because he did not want to risk the uncertainty of who the new judge would be and because he had experience with the assigned judge.  Regardless of the accuracy of counsel's representations regarding the level of experience he had with the trial judge, the proffered reasons were strategic. The only way this Court could determine this strategy constituted deficient performance is if it was so ill chosen that it permeated the entire trial with obvious unfairness. *See Jones*, 287 F.3d at 331.  While petitioner feels the trial judge acted unfairly, he has yet to point to any record evidence (and the Court has found no such evidence) of any unfair rulings or statements from the judge so as to call into question the overall fairness of the second trial. *See id.*

Petitioner also contends counsel improperly sought to suppress petitioner's trial one testimony during the defense's case-in-chief rather than at the pretrial stage.  First, this challenge immediately fails because "[t]he filing of pretrial motions falls squarely within the ambit of trial strategy." *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984).  Moreover, from his own statements in his pleadings before this Court and his statements to the state trial court, petitioner was planning on not testifying at the second trial.  Mr. Medley only decided to testify after the State had concluded its case-in-chief

and during a court recess after he had first indicated he would not testify.  (RR, vol. 7 at 53).  If petitioner was not planning on testifying, there was no need for his attorney to file a motion to suppress any statements from the first trial.  Given counsel's knowledge at the pretrial stage, a pretrial motion to suppress would not have made sense.  *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2052.

Petitioner challenges the quality of counsel's voir dire, but "[t]he attorney's actions during voir dire are considered to be a matter of trial strategy."  *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995).  Petitioner contends trial counsel should have made an opening statement, but again  "[t]he decision of whether to present an opening statement falls with the zone of trial strategy."  *Murray*, 736 F.2d at 283.  In many instances, especially in the context of a criminal case, it is in fact considered wiser to not make an opening statement.  Indeed, as one court observed, "[t]he best hope of defense counsel . . . was to catch the prosecution asleep or lacking evidence at some fatal juncture of the trial. It could well be considered that this was no time for defense counsel, at the very outset, in an opening statement to reveal the weak hand he had to play."  *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965).

Petitioner contends counsel should have impeached Ms. Lambert.  Choices regarding impeachment are generally ones of trial strategy and are not to be second-guessed in a federal habeas corpus proceeding.  *See Mills v. Armontrout*, 926 F.2d 773, 774 (8th Cir.1991) (holding that trial counsel's decision to refrain from impeaching a witness was a reasoned choice of trial strategy not cognizable in a federal habeas corpus claim of ineffective assistance of counsel).

Medley also challenges counsel's cross-examination of Dale Haley, who testified for the State regarding certain items of DNA discovered on Ms. Steinbrecker.  One of those items was a single hair collected from Ms. Steinbrecker's hand.  (RR, vol. 6 at 231).  Regarding that item of evidence, petitioner's attorney cross-examined Mr. Haley as follows:

Q.      Okay.  And this hair, whether it was in or on the hand was submitted for evaluation?

A.      Yes . . .

Q.      As well as submitted with head hair and pubic hair of both the victim and Cliff Medley?

A.      I believe so, yes.

Q.      Okay.  Do you remember the results of that evaluation?

A.      On the --

Q.      Did they identify that single hair to either Frankie Steinbrecker or Cliff Medley?

A.      I believe it was the victim's hair, if I'm not mistaken.

Q.      I'm going to hand you what they've previously marked as State's Exhibit No. 31 and ask you to review that.

A.      Okay.

Q.      See if that helps refresh your memory.  After you've reviewed it, please let me know and I'll continue questioning.
         (Pause)

A.      Okay.

Q.      Doesn't it, in fact, say that there is no basis for absolute personal identification of that hair?

. . . [Further review of the report]

Q.      Does that not say that hair comparison does not constitute a basis for absolute personal identification?

A.      Yes, sir, it does.

(RR, vol. 6 at 231-33).  Petitioner avers, "the FBI and defense Lab [sic] test results prove the forcibly removed hair found in the left hand of the strangled victim does not match Medley.  [Counsel] failed to present this exonerating evidence to the Jury."  ("Petitioner's Reply to Respondent's Brief," doc.

116, pg. 12 (filed May 10, 2012)).  Petitioner misstates the record, as his attorney did question one of

the prosecution's witnesses on the results of "State's Exhibit No. 31," which was the report generated

by the Federal Bureau of Investigation of items collected from the crime scene.  (RR, vol. 6, pg. 231-

33).  Further, counsel also illicited testimony from Mr. Haley that the hair could not be conclusively

linked to either the victim or defendant.  (*Id.* 233).  Counsel then used this concession as the basis for

his argument that someone else, not Mr. Medley, committed the murder.  In fact, in his closing

argument, counsel pointed out that the only DNA evidence linking Mr. Medley to Ms. Steinbrecker's

body was a hair found on the blanket in which Ms. Steinbrecker's body was wrapped:

> We heard from Sgt. Holmes . . . and from Haley and from Smith . . . that there was
> some evidence collected; some fingernails, some hair samples . . . What's the only
> piece of evidence out of all that that tied Cliff Medley to Frankie's death?  One single
> piece of evidence.  And what was it?  A hair found in the blanket that he had been
> sleeping under for at least a month.

(RR, vol. 7 at 222).  Defense counsel's cross-examination of the State's witness regarding the DNA

collected from Ms. Steinbrecker was clearly trial strategy.

Petitioner also challenges counsel's closing statement.

> [C]ounsel has wide latitude in deciding how best to represent a client, and deference
> to counsel's tactical decisions in his closing presentation is particularly important
> because of the broad range of legitimate defense strategy at that stage . . . Judicial
> review of a defense attorney's summation is therefore highly deferential—and doubly
> deferential when it is conducted through the lens of federal habeas.

*Yarborough v. Gentry*, 540 U.S. 1, 5-6, 124 S.Ct. 1, 4, 157 L.Ed.2d 1 (2003).  Here, trial counsel's

closing argument was a reflection of counsel's trial strategy.  *See id.*  Counsel was not deficient in his

closing argument.

Petitioner has failed to overcome the strong presumption that counsel's performance at voir

dire, during the trial, and at the end of the trial was the result of conscious and informed strategy.  *See*

*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2052; *Jones*, 287 F.3d at 331.  Moreover, none of counsel's

strategies permeated the entire trial with obvious unfairness. *See Jones*, 287 F.3d at 331. As such, none of petitioner's challenges support an ineffective assistance of counsel claim. *See id.*

### 4. Claims Regarding Failure to Call Witnesses

Petitioner's challenges to his attorney's failure to call certain witnesses are also meritless. "Complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative. Where the only evidence of a missing witnesses' testimony is from the defendant, this Court views claims of ineffective assistance with great caution." *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986). Petitioner asserts counsel should have called a Dr. Robert Bux as a witness to testify to the results of DNA testing done on Ms. Steinbrecker. Petitioner fails, however, to offer anything other than his own statements as to what Dr. Bux's testimony would have been and how it would have impacted the trial. His unsupported speculation falls short of the level required for federal habeas corpus relief. *See id.* The same holds true for petitioner's assertion that counsel was deficient for not calling Mr. George Thacker. These claims fail because there is nothing before the Court supporting them other than petitioner's speculative statements. *See id.*

### 5. Claims Regarding Failure to Object

Petitioner next contends trial counsel "allowed Judge to compell [sic] Applicant to [take] the stand for Prosecutor's direct examination at voluntariness hearing." ("Petitioner's Appendix," doc. 3-4 at 8). Petitioner fails to provide, however, the grounds upon which counsel could have objected. As detailed in section IV.A.1, above, before petitioner began his testimony at the second trial, his attorney put on the record (outside the jury's presence) his (the attorney's) admonishment to petitioner that "the State may have the ability to use some of [trial one] testimony to impeach you." (RR, vol. 7 at 53-54). Petitioner indicated that, despite this possibility, he still wanted to testify. (*Id.*). At the

beginning of the State's cross-examination of petitioner, the State indicated it had a matter to address with the court outside the jury's presence.  (*Id.* at 80).   Once the jury was excused, the prosecution proffered that, given the variance between petitioner's first and second trial testimonies, it intended to impeach petitioner with his trial one testimony.  (*Id.*).   The trial court conducted a hearing on the voluntariness of petitioner's trial one testimony in order to rule whether such impeachment would be allowed.   Petitioner now asserts the trial judge improperly compelled his testimony at the hearing and that his attorney failed to protect him from it.

First, petitioner seeks to divorce the hearing outside the jury's presence from his voluntary decision to testify.   It was not until petitioner decided to take the stand and testify that the trial judge allowed the issue of impeachment to be addressed.   The trial judge did not compel any testimony. Petitioner seems to think he should have been able to testify on his own behalf, give his version of events, and then be protected from any kind of further questioning.   To the contrary, once he voluntarily took the stand at the second trial, Medley waived his privilege against compulsory self-incrimination.  *See Harrison*, 392 U.S. at 222, 88 S.Ct. at 2010.   Further, petitioner's attorney had warned him that the State might use his testimony from the first trial to impeach him at the second trial. The trial court sought to ensure petitioner's trial one testimony was admissible and had been voluntarily given before allowing such testimony to be used at the second trial in order to protect petitioner's rights.   The trial court's actions were not only not objectionable, they were necessary. Moreover, the voluntariness of petitioner's trial one testimony was determined by the court based upon the circumstances at the first trial.   Petitioner also contends his attorney should have sought to present the issue to the jury.   The trial judge, however, acted in conformity with state law, and once he had decided the trial one testimony was voluntary, the issue was settled.   Medley has not shown it would have been proper to present the issue to the jury for re-evaluation much less demonstrated what

additional action his attorney should have taken. *See Vuong v. State*, 830 S.W.2d 929, 936 (Tex. Crim. App. 1992).

In sum, petitioner's assertions of ineffective assistance of trial counsel are all conclusory, and many are lacking in analysis or development. Several of his contentions are not supported by the record or are flatly contradicted by it. Beyond this, in all of his assertions, petitioner has not shown in any manner how his trial attorney's representation was deficient. For these reasons, Mr. Medley's ineffective assistance of trial counsel claims must fail.

### 6. Petitioner has Failed to Demonstrate Prejudice

Assuming, solely for the purposes of argument, petitioner has somehow demonstrated deficient performance, he fails to show any prejudice. As detailed above, there was significant, strong circumstantial evidence offered against petitioner. The victim's son testified Medley and the victim were fighting over the victim leaving Mr. Medley, and Mr. Medley was very angry on the day of the move. Ms. Steinbrecker's son also testified the last time he saw his mother alive was with Mr. Medley. Mr. Medley consistently testified to disposing of Ms. Steinbrecker's body. While claiming his innocence, Mr. Medley admitted he did not contact the police or any kind of ambulance when he discovered the body. His behavior the next day, when he attempted to hide out in the farmer's detached garage and avoid detection by the farmer, was evidence which could indicate guilt. Mr. Medley offered testimony to explain his behavior, but the jury did not accept it. That credibility determination was within the sole discretion of the jury. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (stating it is the fact-finder's responsibility alone to fairly "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Assuming trial counsel had taken some or all of the actions petitioner claims he should have taken, petitioner is unable to show how the evidence against him would have

lessened to the extent it would have changed the jury's verdict.  *See Strickland*, 466 U.S. at 687, 104

S.Ct. at 2064.  Petitioner has not shown a reasonable probability the ultimate result of the proceeding

would have been different had trial counsel not committed what petitioner contends were multiple

"errors."  *See Creel*, 162 F.3d at 395.  He has not shown how any of counsel's actions rendered the

trial fundamentally unfair.  *See id.*  Petitioner's ineffective assistance of trial counsel claims fail not

only because petitioner has not demonstrated deficient performance but also because he has not shown

prejudice.  *See Spriggs*, 993 F.2d at 88 n.4.

### G.  Ineffective Assistance of Appellate Counsel

In his final ground of error, petitioner contends he received ineffective assistance of appellate

counsel.  Specifically, petitioner avers appointed appellate counsel performed deficiently because she

did not want to anger the judge, who appoints her to cases.  Petitioner contends appellate counsel's

*Anders* brief was unjustified because both he and trial counsel pointed out strong grounds of appeal

which counsel could raise.  In a proposed "expoundment" of this ground, petitioner states appellate

counsel should have argued that admission of trial one testimony at the retrial violated Texas Code of

Criminal Procedure article 38.23 and was fruit of the poisonous tree, and the trial court failed to

consider the totality of the circumstances in allowing the testimony.  ("Petitioner's Expoundment of

Habeas Ground Nine with Brief in Support," doc. 129-1, pgs. 12-19 (June 10, 2013)).

A defendant has a constitutional right to effective assistance of counsel on first appeal.  *Hughes*

*v. Booker*, 220 F.3d 346, 348 (5th Cir. 2000).  Where a petitioner argues counsel failed to assert or

fully brief a particular claim on appeal, he must meet both prongs of the *Strickland* test, i.e. he must

show his attorney's performance was both deficient and prejudicial.  *Id.* (citing *Penson v. Ohio*, 488

U.S. 75, 84, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988)).  Appellate counsel's performance is deficient if

it falls below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88, 104 S.Ct. at

2064.  The appellate attorney need not raise every nonfrivolous ground available on appeal.  *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006).  Counsel's performance is prejudicial if, but for the appellate attorney's unreasonable failure to raise an issue, the defendant would have prevailed on his appeal.  *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000).

As with his ineffective assistance of trial counsel claims, petitioner's claims of ineffective assistance of appellate counsel are conclusory.  His assertions that counsel filed an *Anders* brief because she was afraid of retaliation from the trial judge has no support in the record.  *See Ross*, 695 F.2d at 1011.  Petitioner's contention that appellate counsel's *Anders* brief was unjustified because both he and trial counsel pointed out strong grounds for appeal is likewise meritless.  Appellate counsel discussed in her *Anders* brief whether the trial court erred in allowing the State to impeach petitioner with his trial one testimony, whether the trial court erred in finding petitioner's trial one testimony was voluntary, and whether the trial court's punishment charge was correct.  Counsel concluded all of these arguments were without merit and stated why.  Appellate counsel was not deficient for failing to raise what her analysis revealed were meritless grounds of error.  *See Amador*, 458 F.3d at 410.  Furthermore, she was not deficient for failing to raise the multiple meritless grounds of error raised by petitioner, including petitioner's assertions that had counsel raised arguments based on article 38.23 of the Texas Code of Criminal Procedure, the law of the case, and due process and equal protection he would have won the appeal.  ("Petitioner's Expoundment of Habeas Ground Nine with Brief in Support," doc. 129-1 at 12-19).  Petitioner has not shown appellate counsel's performance was deficient.

Even if it is assumed, *arguendo*, appellate counsel's performance was in some manner deficient, petitioner has failed to demonstrate he suffered any prejudice.  After appellate counsel filed her *Anders* brief, petitioner filed a fifty-page pro se appellate brief.  In his appellate brief, petitioner

presented the very arguments he contends appellate counsel should have presented.  Not only did the appellate court decline to grant relief on the very arguments he submits counsel should have presented, but the appellate court considered and addressed the major claim presented, i.e., the use of his prior testimony.  Consequently, petitioner cannot demonstrate that but for his attorney's failure to raise certain issues on appeal he would have prevailed.  *See Smith*, 528 U.S. at 285, 120 S.Ct. at 764. Petitioner has demonstrated neither deficient performance nor prejudice.  *See Strickland*, 466 U.S. at 687-88, 104 S.Ct. at 2064.  Petitioner's ninth ground of error is meritless.

V.
RECOMMENDATION

Petitioner has failed to present any claim warranting federal habeas corpus relief.  Therefore, it is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the Petition for a Writ of Habeas Corpus by a Person in State Custody filed by petitioner CLIFFORD SCOTT MEDLEY be DENIED.

VI.
INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 11th day of July, 2013.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).